

**Signed January 11, 2013.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**
_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 11-31024-HCM |
| PATRIOT PLACE, LTD., | § | |
| Debtor. | § | (Chapter 11) |
| IN RE: | § | Case No. 12-31019-HCM |
| THREE LEGGED MONKEY, L.P., | § | |
| Debtor. | § | (Chapter 11) |

### CONSOLIDATED OPINION
### REGARDING MOTION TO ASSUME SHOPPING CENTER LEASE,
### CONFIRMATION OF PLANS OF REORGANIZATION, AND RELATED MOTIONS

These controversies present the latest episode of an ongoing public saga that found its way to this Court, when the Chapter 11 bankruptcy filing of one debtor (Patriot Place) spawned yet another Chapter 11 bankruptcy filing by a different debtor (Three Legged Monkey). This latest episode became a battle between one debtor (Patriot Place, the owner and landlord of Hawkins Plaza) that wants to sell its business at Hawkins Plaza to the City of El Paso to settle its ground lease dispute with the City—and the other debtor (Three Legged Monkey, a rather notorious tenant at Hawkins Plaza) that is fighting the proposed sale to the City so that it can save its business at Hawkins Plaza. Many interesting factual and legal issues are presented in this very unusual and highly contentious battle between two separate debtors, with the City waiting in the wings.

Will this be the final episode of the saga? Regrettably, no.

1

# I.
# INTRODUCTION

## A. CONSOLIDATED HEARING AND CONSOLIDATED OPINION

On November 15 and 16, and December 6, 7, and 11, 2012, the Court conducted a consolidated hearing (herein "Consolidated Hearing") with respect to the following contested matters: (1) Motion to Assume Non-Residential Lease of Real Property With Patriot Place Pursuant to 11 U.S.C §365 filed by Three-Legged Monkey L.P. in case no. 12-31019 (dkt# 18), and all objections and responses thereto; (2) confirmation of the competing Second Amended Plan of Reorganization, as amended, filed by Three Legged Monkey L.P. in case no. 11-31024 (dkt# 275, 358), and all objections and responses thereto; (3) confirmation of the Third Amended Plan of Reorganization, as modified, filed by Patriot Place Ltd. in case no. 11-31024 (dkt# 283, 348, 367, 396) and all objections and responses thereto; (4) Motion For Determination of Value of Leasehold Interest of Three Legged Monkey at Hawkins Plaza Shopping Center Pursuant to 11 U.S.C. §363(e) and (f) filed by Patriot Place Ltd. in case no. 11-31024 (dkt# 330), and all objections and responses thereto; (5) Expedited Motion To Designate the Classes of 1(A) and 3 As Being Unimpaired and Strike the Ballots of Such Classes As Not Being Accepted, Solicited or Procured in Good faith Pursuant to 11 U.S.C. §1126(E) filed by Three Legged Monkey L.P. in case no. 11-31024 (dkt# 337), and all objections and responses thereto; and (6) Request to Strike Ballots of Three Legged Monkey filed by Patriot Place Ltd. in case no. 11-31024 (dkt# 357), and all objections and responses thereto (herein collectively "Contested Matters").

The Court consolidated the hearing and evidence on all of the Contested Matters under Rules 7042(a)(1) and 9014(c) of the Federal Rules of Bankruptcy Procedure (herein "Bankruptcy Rules") due to the common questions of fact and law, as well as the common witnesses, exhibits and evidence with respect to the Contested Matters.

This Consolidated Opinion constitutes the Court's findings of fact and conclusions of law with respect to each of the Contested Matters in accordance with Bankruptcy Rules 7052(a)(1) and 9014(c).[1] In reaching the findings and conclusions set forth in this Consolidated Opinion, the Court has considered and weighed all the evidence, testimony, admitted exhibits, arguments of counsel, and pleadings and briefs filed by all parties with respect to the Contested Matters, regardless of whether or not they are specifically referred to in this Consolidated Opinion.

## B. JURISDICTION

The Court has jurisdiction over each of the Contested Matters under 28 U.S.C. §§157 and 1334. The Contested Matters arise in bankruptcy cases referred to this Court by the Standing Order of Reference entered in this District. The Contested Matters are

---

[1] To the extent any finding of fact is construed to be a conclusion of law in this Consolidated Opinion, they are hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact in this Consolidated Opinion, they are hereby adopted as such.

core proceedings pursuant to 28 U.S.C. §157(b)(2)(A), (L), (M) and (N).  The Court is authorized to enter a Final Order with respect to each of the Contested Matters.

## II.
## PROCEDURAL BACKGROUND

### A. BANKRUPTCY CASES—PROCEDURAL BACKGROUND

On May 30, 2011, Patriot Place Ltd. (herein "PPL"), as a debtor, filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this Court, case no. 11-31024 (herein "PPL Case"). PPL owns and operates a shopping center known as Hawkins Plaza, and leases space to various tenants.

On July 26, 2011, PPL filed a Motion For Order Authorizing the Assumption of Commercial Ground Lease with the El Paso International Airport/City of El Paso (herein "Motion to Assume Ground Lease") in the PPL Case (PPL Case, dkt# 29). In general, through this Motion, PPL sought to assume a Commercial Ground Lease dated May 10, 1996 (herein "Ground Lease") between PPL, as lessee, and the City of El Paso (herein "City"), as lessor. Shortly thereafter, on July 29, 2011, PPL filed an Omnibus Motion For Order Authorizing Assumption of Fifteen Unexpired Leases with Current Tenants of Hawkins Plaza (herein "Motion to Assume Tenant Leases") (PPL Case, dkt# 34). In general, through this Motion, PPL sought to assume the leases with its tenants at Hawkins Plaza, including its shopping center lease with Three Legged Monkey L.P.

In August and September 2011, the City filed Objections to PPL's Motion to Assume Ground Lease and Motion to Assume Tenant Leases (PPL Case, dkt# 36, 41, 62). In general, through such Objections, the City contended that the Ground Lease could not be assumed and should be terminated, primarily based on the activities of the Three-Legged Monkey L.P., a tenant of PPL. On August 18, 2011, City Bank ("City Bank") filed a Response and Joinder, supporting PPL's Motion to Assume Ground Lease (PPL Case, dkt# 39).  At these parties' request, the Court entered a Scheduling Order on September 8, 2011 with respect to the Motion to Assume Ground Lease and related Motions (PPL case, dkt #57). Such Scheduling Order set a hearing on the merits for December 16, 2011 on the Motion to Assume Ground Lease and related Motions, and ordered PPL, the City, and City Bank to participate in mediation in an effort to resolve their disputes. Due to the length of the mediation, and at the request of these parties, the Court amended and extended various deadlines in the Scheduling Order.

The mediation between PPL and the City was conducted before retired Bankruptcy Judge Frank R. Monroe over a period of several months. This mediation culminated in a Settlement Agreement dated May 23, 2012 between the City and PPL (herein "Settlement Agreement"), which was subject to Court approval through a Plan of Reorganization to be filed by PPL (PPL Case, dkt# 283, Ex. A). As a result, the Court continued the hearing on the merits on the Motion to Assume Ground Lease, Motion to Assume Tenant Leases, and related Motions, so that approval of the Settlement

3

Agreement could be sought from the Court. The Court also set a deadline of June 11, 2012 for PPL to file a proposed Plan of Reorganization seeking Court approval of the Settlement Agreement (PPL Case, dkt# 161). The Settlement Agreement between PPL and the City, provided, in part, for the termination of the shopping center lease between PPL and Three Legged Monkey L.P., and the sale of Hawkins Plaza by PPL to the City.

Shortly thereafter, on June 2, 2012, Three Legged Monkey L.P. (herein "3LM") as a debtor, filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this Court, case no. 12-31019 (herein "3LM Case").  3LM operates a sports bar and restaurant in Hawkins Plaza.  3LM leases its facilities from PPL pursuant to a Shopping Center Lease dated November 28, 2005 (herein "Shopping Center Lease") between PPL, as landlord, and 3LM, as tenant.

On June 28, 2012, PPL filed a Motion For Relief From Automatic Stay in the 3LM Case (3LM Case, dkt# 21), which was opposed by 3LM. On August 16, 2012, the Court conducted a hearing on such Motion. By Order entered August 17, 2012, the Court granted such Motion and lifted the automatic stay in the 3LM Case so that PPL could proceed with seeking confirmation of its Plan of Reorganization in the PPL Case (herein "Order Lifting Stay") (3LM Case, dkt# 62).[2]

## B.  CONTESTED MATTERS—PROCEDURAL BACKGROUND

On June 12, 2012, PPL filed its proposed Plan of Reorganization and accompanying Disclosure Statement in the PPL Case, based on its Settlement Agreement with the City (PPL Case, dkt# 169, 170).  Following a series of hearings and various amendments, PPL filed its proposed Third Amended Plan of Reorganization on September 20, 2012 (PPL Case, dkt# 283). On September 21, 2012, the Court entered an Order approving PPL's Third Amended Disclosure Statement for its proposed Third Amended Plan and set November 15, 2012 as the date for the confirmation hearing on the PPL Third Amended Plan (PPL Case, dkt# 284).

The PPL Third Amended Plan with accompanying Disclosure Statement was then mailed to creditors and parties in interest for voting and objections. On November 2, 2012, PPL filed its Ballot Summary reflecting the voting by creditors on the PPL Third Amended Plan (herein "PPL Plan Ballot Summary") (PPL Case, dkt# 328). Limited objections to confirmation of PPL's Third Amended Plan were filed by the City of El Paso Tax Assessor and the U.S. Trustee, which were later withdrawn (PPL Case, dkt # 313, 316). Significant objections to confirmation of PPL's Third Amended Plan were filed by 3LM and Monaco Entertainment Group (herein "Monaco") (PPL Case, dkt# 324, 322). Thereafter, PPL filed its First Preconfirmation Modification to its Third Amended Plan (PPL Case, dkt# 348), its Second Preconfirmation Modification to its Third Amended Plan (PPL Case, dkt# 367), and finally its Third Preconfirmation Modification to its Third Amended Plan (PPL Case, dkt# 396). PPL's Third Amended Plan of Reorganization, as modified by such First, Second and Third Preconfirmation Modifications (PPL Case, dkt# 283, 348, 367, 396) are collectively referred to herein as

---

[2] It may be noted that 3LM has appealed the Order Lifting Stay, which is pending.

the "PPL Plan". Confirmation of the PPL Plan is one of the Contested Matters that was the subject of the Consolidated Hearing and of this Consolidated Opinion.

On August 15, 2012, 3LM filed a proposed competing Plan of Reorganization for PPL in the PPL Case, and accompanying Disclosure Statement (PPL Case, dkt# 221, 222). Following a series of hearings and various amendments, 3LM filed its proposed competing Second Amended Plan of Reorganization for PPL on September 19, 2012 (PPL Case, dkt# 275). On September 21, 2012, the Court entered an Order approving 3LM's Second Amended Disclosure Statement for its proposed competing Second Amended Plan and set November 15, 2012 as the date for the confirmation hearing on the PPL Third Amended Plan (PPL Case, dkt# 285).

The 3LM competing Second Amended Plan with accompanying Disclosure Statement was then mailed to creditors and parties in interest for voting and objections. On November 2, 2012, 3LM filed its Ballot Summary reflecting the voting by creditors on 3LM's competing Second Amended Plan for PPL (herein "3LM Competing Plan Ballot Summary") (PPL Case, dkt# 327). On November 9, 2012, 3LM filed a Notice of Failure to Agree on Litigation Trustee and Request to Appoint David Brandt as Litigation Trustee under the 3LM competing Second Amended Plan (PPL Case, dkt# 345). A limited objection to confirmation of 3LM's competing Second Amended Plan was filed by the U.S. Trustee, which was later withdrawn based on an amendment by 3LM (PPL Case, dkt# 315). Significant objections to confirmation of 3LM's Competing Second Amended Plan were filed by PPL, City Bank, the City, and Monaco (PPL Case, dkt# 319, 320, 321, 323, 325, 326). On November 2, 2012, 3LM filed its Responses and Brief to the Objections (PPL Case, dkt# 329). Subsequently, 3LM filed a Plan Amendment to its competing Second Amended Plan (PPL Case, dkt# 358). 3LM's competing Second Amended Plan of Reorganization as further amended by its Plan Amendment (PPL Case, dkt# 275, 358) is collectively referred to herein as the "3LM Competing Plan". Confirmation of the 3LM Competing Plan is one of the Contested Matters that was the subject of the Consolidated Hearing and of this Consolidated Opinion.

On November 5, 2012, PPL filed a Motion For Determination of Value of Leasehold Interest of Three Legged Monkey at Hawkins Plaza Shopping Center Pursuant to 11 U.S.C. §363(e) and (f) in the PPL Case (herein "Motion to Value Leasehold") (PPL Case, dkt# 330). On November 14, 2012, 3LM filed its Objection to the Motion to Value Leasehold, and on November 14, 2012 PPL filed its Reply (PPL Case, dkt# 359, 363). The Motion to Value Leasehold is one of the Contested Matters that was the subject of the Consolidated Hearing and of this Consolidated Opinion.

On November 7, 2012, 3LM filed its Expedited Motion To Designate the Classes of 1(A) and 3 As Being Unimpaired and Strike the Ballots of Such Classes As Not Being Accepted, Solicited or Procured in Good faith Pursuant to 11 U.S.C. §1126(E)  in the PPL Case (herein "3LM Motion to Strike Ballots") (PPL Case, dkt# 337). In general, through such Motion, 3LM sought to strike the ballots of City Bank and other tenants which voted in favor of the PPL Plan. On November 13, 2012, City Bank and PPL filed Responses to the 3LM Motion to Strike Ballots (PPL Case, dkt# 355, 357). The 3LM

Motion to Strike Ballots is one of the Contested Matters that was the subject of the Consolidated Hearing and of this Consolidated Opinion.

On November 13, 2012, PPL filed a Request to Strike Ballots of Three Legged Monkey in the PPL Case (herein "PPL Request to Strike Ballots") (PPL Case, dkt# 357). In general, through such Request, PPL sought to strike the ballots of 3LM, who voted against the PPL Plan. The PPL Request to Strike Ballots is one of the Contested Matters that was the subject of the Consolidated Hearing and of this Consolidated Opinion.

Meanwhile, in the 3LM Case, 3LM filed a Motion to Assume Non-Residential Lease of Real Property With Patriot Place Pursuant to 11 U.S.C §365 on June 25, 2012 (herein "Motion to Assume Shopping Center Lease") (3LM Case, dkt# 18). In general, through this Motion, 3LM sought to assume the Shopping Center Lease between 3LM, as tenant, and PPL, as landlord. In July, August, and November 2012, PPL filed Objections, as amended and supplemented, to the Motion To Assume Shopping Center Lease (3LM Case, dkt# 34, 55, 68, 121). In general, through such Objections, PPL opposed the assumption of the Shopping Center Lease by 3LM due to alleged defaults. In July and September 2012, the Court entered a Scheduling Order, as modified, with respect to the Motion to Assume Shopping Center Lease (3LM Case, dkt# 43, 77). Pursuant to such Scheduling Order, a hearing on the merits was set on the Motion to Assume Shopping Center Lease for November 15, 2012, 3LM and PPL filed a Joint Pretrial Order (herein "Joint PTO"), and each filed respective pre-hearing and post-hearing memorandums of law and trial briefs  (3LM case, dkt# 128, 129; PPL Case, dkt# 395). The Motion to Assume Shopping Center Lease is one of the Contested Matters that was the subject of the Consolidated Hearing and of this Consolidated Opinion.

Following completion of the Consolidated Hearing and closing arguments with respect to the Contested Matters held on December 11, 2012, the Court entered an Order setting December 19, 2012 as the deadline for the filing of plan modifications, certain post-hearing statements,  and any post-hearing briefs (PPL Case, dkt #390; 3LM Case, dkt# 168). On December 19, 2012, PPL filed its Third Preconfirmation Modification to its Third Amended Plan, Proposed Disbursement of Sales Proceeds and Deposits under the PPL Plan, and Memorandum of Authorities in Support of Confirmation of the PPL Plan (PPL Case, dkt# 396, 397, 398). On December 19, 2012, 3LM filed its Post-Trial Brief and Notice of Estimate of Professional Fees (3LM Case, dkt# 173, 174; PPL Case, dkt# 395). On December 20, 2012, the City filed its Statement regarding confirmation of the PPL Plan (PPL Case, dkt# 399). On January 2, 2013, 3LM filed a Response to PPL's Third Preconfirmation Modification to its Third Amended Plan (PPL Case, dkt# 401).

### III.
### FACTUAL BACKGROUND AND FINDINGS OF FACT

On November 15 and 16, and December 6, 7, and 11, 2012, the Court conducted the Consolidated Hearing. Six witnesses testified at the Consolidated Hearing: (1) David Brandt (herein "Brandt"), the principal of PPL; (2) James Michael ('Mike') Armstrong (herein "Armstrong"), the principal of 3LM; (3) Ralph ('Pete') Sellers (herein "Sellers"), an El Paso real estate appraiser and consultant retained by PPL; (4) Ann Lee Herkenhoff (herein "Herkenhoff"), a City Bank representative; (5) Maria Mejia (herein "Mejia"), former administrative assistant to District 3 City of El Paso Representative Lozano and former Interim District 3 City of El Paso Representative; and (6) Ayida Gallardo (herein "Gallardo"), 3LM's bookkeeper. Numerous exhibits were admitted into evidence by PPL (herein "PPL Ex."), 3LM (herein "3LM Ex."), and City Bank (herein "City Bank Ex.").

**Background**

Hawkins Plaza Ltd. entered into a Commercial Ground Lease (herein "Ground Lease") with the City of El Paso (herein "City") for the Hawkins Plaza Shopping Center (herein "Hawkins Plaza") on May 10, 1996 (PPL Ex. 1). The Ground Lease was assigned from Hawkins Plaza, Ltd. to PPL on March 10, 1995 as part of Hawkins Plaza Ltd.'s plan of eorganization in bankruptcy case no. 93-30278. Hawkins Plaza is a shopping center located at 1550 Hawkins Boulevard, El Paso, Texas. Hawkins Plaza is on real estate that is part of the El Paso International Airport (herein "Airport") which is owned by the City (PPL Ex. 1). The stated term of the Ground Lease expires in the year 2025. PPL owns the improvements (primarily buildings) located at Hawkins Plaza and leases the underlying real estate from the City under the Ground Lease. City Bank is a secured creditor of PPL, and is owed about $1.4 million which is secured by the Hawkins Plaza.

PPL leases space in Hawkins Plaza to numerous retail tenants, including 3LM. Brandt testified at the Consolidated Hearing that there were 12 tenants currently at Hawkins Plaza, including 3LM. Of these leases, all but 3LM's are relatively short-term leases.

PPL first entered into a lease in 2003 with 3LM. Thereafter, PPL and 3LM entered into a Shopping Center Lease Agreement dated November 28, 2005 (herein "Shopping Center Lease") (PPL Ex. 2). The Shopping Center Lease has a stated term of 20 years and expires in 2025, and increased the leased space to 7,271 sq. ft., encompassing suites 2–6 of Hawkins Plaza (PPL Ex. 2).

At the Consolidated Hearing, Armstrong testified that 3LM requested a long term lease from PPL because he realized the value of the Hawkins Plaza location and viewed it as an asset. Armstrong also wanted to preserve the improvements 3LM had made to the leased premises and the 3LM brand that he had created at Hawkins Plaza.

7

Immediately after signing the Shopping Center Lease, 3LM made the new suites accessible to the old suite that 3LM had already been leasing from PPL, in addition to making bathroom renovations, and purchasing new equipment. In total these renovations cost 3LM about $100,000.

3LM operates a sports bar and restaurant in Hawkins Plaza known as the "Three Legged Monkey". 3LM currently employs about 30 persons, and has historically been a profitable business. 3LM has paid its rent and CAM charges on time to PPL under the Shopping Center Lease except for one instance when 3LM paid its rent eight days late, because 3LM was setting up a required debtor-in-possession account once it filed Chapter 11 bankruptcy.  3LM is the major and anchor tenant in the Hawkins Plaza, from a rent paying perspective.

**Issues with Neighbors/City/TABC**

In the past, the 3LM establishment has been plagued with complaints from some residential neighbors in the nearby and well-established Cielo Vista neighborhood. Such complaints appear to have been centered on the behavior of 3LM's patrons, including parking in the neighborhood, sometimes unruly behavior, and noise emanating from the 3LM establishment. These neighbors, in turn, apparently have complained to the City. The City, in turn, has complained to PPL. PPL, in turn, has complained to 3LM. Armstrong testified at the Consolidated Hearing that the complaints came from a small number of vocal neighbors.

At the Consolidated Hearing, Armstrong stated that when 3LM first became a tenant at Hawkins Plaza, there were no parking problems. According to Armstrong, parking problems began in 2007 when Wet Ultra Lounge nightclub (herein "Wet") became a tenant at Hawkins Plaza. Moreover, Armstrong said that once Wet left Hawkins Plaza in 2010, there were no longer any parking issues, and that today there is adequate parking at Hawkins Plaza for 3LM's patrons.  Brandt (on behalf of PPL) testified that some neighbors first complained to the City about 3LM in January 2008. Brandt admitted that parking was a big problem at Hawkins Plaza and that Wet was a big contributor to the parking problem. Armstrong testified that Brandt told him sometime after 2010 that the problems with neighbors did not exist anymore, based on the deposition of John Billingsley (apparently a Cielo Vista neighbor) taken in a June 2010 TABC proceeding.

3LM for its part, attempted to appease the complaints by meeting with City officials and neighbors, increasing security, working with PPL to obtain additional parking, reducing its occupancy level, and changing its business model from primarily a bar to a restaurant. Perhaps as a natural result of neighborhood complaints, the Texas Alcoholic Beverage Commission (herein "TABC") has also closely monitored 3LM,  and challenged (albeit unsuccessfully to date) 3LM's liquor license. 3LM has also addressed the situation by hiring lawyers, filing lawsuits, and fighting back, sometimes needlessly escalating the situation.

8

PPL has, for the most part, been stuck in the middle of this dispute between its major tenant (3LM) and its ground lessor (the City). For example, on March 28, 2011, counsel for the City sent one of many demand letters to PPL. Such demand letter alleged that PPL was in default on the Ground Lease by failing to operate Hawkins Plaza as a "first class shopping center" pursuant to the Ground Lease, which was based primarily on 3LM's establishment (PPL Ex.3). The City claimed PPL had allowed Hawkins Plaza to be used by (1) persons armed with deadly weapons who were involved in a fatal shooting; (2) persons engaging in fighting; (3) loud, drunken patrons engaging in noxious and offensive conduct that has disrupted the adjoining neighborhood; and (4) sublessees who permitted those same uses (PPL Ex. 3). The City also asserted parking violations under Article IV, "Development of Site – Required Improvements." The City demanded that PPL "comply with the covenants and conditions required in the [Ground Lease] and cure the foregoing violations by immediately implementing all means necessary to prevent further violations" [added] (PPL Ex. 3).

On April 25, 2011, counsel for PPL sent a lengthy response to the City in *de facto* defense of 3LM that disputed the alleged defaults in the Ground Lease (3LM Ex. 4). This letter detailed remedial measures undertaken by PPL to cure any alleged defaults and also denied that PPL was not operating a "first class shopping center" because the City had allowed 3LM and other bars to lease at Hawkins Plaza. At the Consolidated Hearing, Armstrong testified that PPL leased to bars and restaurants that served alcohol throughout the ten years that 3LM had been a tenant at Hawkins Plaza. Armstrong also maintained that he operated 3LM as a bar and restaurant in compliance with the terms of the Shopping Center Lease. Both Armstrong (on behalf of 3LM) and Brandt (on behalf of PPL) testified that there was no default under the Ground Lease with the City, and that Hawkins Plaza was a "first class shopping center" as required under the Ground Lease with the City.

At the Consolidated Hearing, Brandt (on behalf of PPL) and Armstrong (on behalf of 3LM) testified that during this time frame they began discussions with the City to obtain additional parking space. Brandt (on behalf of PPL) even agreed to lease an unpaved lot connected to Hawkins Plaza from the City. However, according to Armstrong and Brandt, the City would not allow PPL to pave the area they had leased from the City for parking. According to Armstrong, the City also refused to lease the adjacent City swimming pool or golf course parking lot, even though the City permitted this type of parking arrangement with bars and restaurants in other areas of El Paso.

Mejia, who in early 2008 worked as the Interim District 3 City of El Paso Representative—which encompassed both Hawkins Plaza and the Cielo Vista neighborhood—testified at the Consolidated Hearing. According to Mejia, she met with Armstrong, the City's Chief of Police, Mayor John Cook, future District 3 Representative Emma Acosta, and representatives from the City's fire department, the Airport, and the Cielo Vista neighborhood about leasing this parking lot from the City. Mejia stated that no one at the meeting had a problem with leasing the parking lot for 3LM's use, but that later the City would not lease the parking lot. Mejia also testified that during this same

time period she had the City install signs in the Cielo Vista neighborhood that provided notice that cars would be towed if they parked in the neighborhood without proper neighborhood permits. After numerous 3LM patrons' cars were towed, Mejia said people stopped parking in the Cielo Vista neighborhood. Furthermore, Mejia testified that while she worked for the City, she was not aware of any City Code violations committed by 3LM.

One catalyst for the current dispute occurred in May 2008 when 3LM hosted a "Drinko de Mayo" event in the Hawkins Plaza parking lot. Thousands of guests came to the party and parked in the surrounding Cielo Vista neighborhood. At the Consolidated Hearing, Armstrong testified that 3LM obtained both the TABC and PPL's approval for this event. However, Brandt stated that he did not remember Armstrong asking for PPL permission to have the event in the Hawkins Plaza parking lot. Armstrong said that although the Drinko de Mayo event was very successful financially for 3LM, it hurt 3LM's relationship with the neighbors, which led Armstrong to decide that 3LM would never again have another parking lot event.

In an attempt to resolve the City's and neighbors' concerns, PPL and the City mediated their dispute for two days in 2010. According to Brandt, two neighborhood representatives attended the mediation and advocated for 3LM's removal from Hawkins Plaza, and as a result the mediation failed to produce a resolution.

During this time frame, 3LM undertook remedial measures to address the concerns of the City, neighbors, and the TABC. At the Consolidated Hearing, Armstrong testified that 3LM installed sound reducing foam at 3LM to reduce the noise levels at a cost of about $10,000. In a June 2010 Agreed Order with the TABC (herein "2010 Agreed TABC Order"), 3LM and Armstrong also voluntarily agreed to: (1) reduce the 3LM occupancy level from 695 to 500 and station a doorperson at the front door with a counter device after 9:00 pm; (2) employ 1–8 security staff to clear the parking lot from Wednesday through Sunday nights; (3) turn off music at 1:50 am, stop selling alcohol at 2:00 am, ensure patrons have ceased consumption by 2:15 am, and begin to clear out the parking lot by 2:30 am; (4) permanently cease any promotional parties or events in the parking lot; (5) agree to take decibels level measurements from the street at 11:00 pm and 1:00 am each night; (6) prohibit minors in the establishment after 8:00 pm; (7) install signs in the parking lot stating "No Loitering" and "No Cruising"; (8) extend the hours of food sales to 12:00 am; (9) have 3LM employees attend a bi-annual MAPS classes as TABC scheduled; and (10) attend a quarterly meeting with the TABC and El Paso Police Department to address any outstanding concerns  (PPL Ex. 26). Armstrong testified that as part of these changes, he also decided to remake 3LM's business model as "3LM 2.0", which consisted of including more food items on the menu— thereby necessitating hiring more cooks—and attempting to create more of a family friendly sports atmosphere by installing games and decorating 3LM with sports paraphernalia.

Unfortunately, even after these changes, on Super Bowl Sunday in February 2011, a 3LM patron was shot and killed after a fight spilled outside the 3LM

establishment. Armstrong was present the day the shooting occurred. Armstrong maintained at the Consolidated Hearing that both he and 3LM acted responsibly during this unfortunate incident, which appears to have been corroborated recently by an Administrative Law Judge.

Based on this February 2011 shooting incident and alleged violations of the 2010 Agreed TABC Order, the TABC initiated an administrative proceeding against 3LM in the State Office of Administrative Hearings (herein "SOAH") before an Administrative Law Judge, seeking to cancel 3LM's liquor permit. In the SOAH administrative proceeding, 3LM and the TABC appeared for a "common nuisance" hearing in October 2011. On November 2, 2011, the Administrative Law Judge issued an Order Memorializing Agreed Additional Conditions on Permit and Denying Condition for Early Closure Based on Common Nuisance (herein "2011 TABC Order"), which denied the common nuisance claim against 3LM (PPL Ex. 36). The 2011 TABC Order also added the following conditions to 3LM's business, with the agreement of 3LM: (1) no unaccompanied minor would be allowed on the premises after 8:00 pm, and no minor whatsoever would be allowed after 11:00 pm; (2) 3LM would contract with three security guards to control the parking lot, rear driveway, and other exterior areas of the premises from Friday through Sunday from 10:00 pm to 2:00 am; (3) security guards would prevent loitering; (4) personnel would be stationed at each unlocked exit or entrance on Friday through Sunday from 10:00 pm to 2:00 am to prevent entry of unauthorized persons and persons exiting with alcoholic beverages; (5) 3LM would place signs on each entrance and exit door informing patrons how to contact the TABC for the purpose of making complaints; and (6) 3LM would provide weekly reports of the occupancy levels of the premises during business hours (PPL Ex. 36).

Very recently, on November 5, 2012 and after hearing evidence, the Administrative Law Judge in the SOAH proceeding issued a Proposal for Decision (herein "PFD"). The Administrative Law Judge recommended that 3LM's liquor permit not be cancelled based on the violations alleged by the TABC and the February 2011 shooting incident outside 3LM's establishment (3LM Ex. 42). Among other findings, the Administrative Law Judge determined that "it [was] unreasonable to propose [3LM] could have controlled the shooting, predicted it, or prevented it" (3LM Ex. 42, p. 17). The Administrative Law Judge also found that "the evidence [did] not prove [3LM] conducted [their] business in a manner in violation of the general welfare, health, peace, morals of the people and public sense of decency" (3LM Ex. 42, p. 20). The only violation the Administrative Law Judge found was that 3LM exceeded the 500-person occupancy limit on one occasion in September 4, 2011. Accordingly, the Administrative Law Judge denied the TABC's request to cancel 3LM's liquor license.

**PPL Chapter 11 Bankruptcy**

When the City placed an item on the City Council Agenda to terminate the Ground Lease between PPL and the City—largely based on the activities of 3LM—PPL filed for Chapter 11 bankruptcy reorganization in this Court on May 30, 2011 (PPL Case, dkt# 1). Brandt testified that PPL filed for bankruptcy in good faith in an effort to

protect a valuable asset—its Ground Lease with the City for Hawkins Plaza. PPL has been operating as a debtor-in-possession since the filing of its bankruptcy case. PPL has been a profitable enterprise, has remained current on its loan to City Bank and has few, if any, other creditors.

Shortly after its bankruptcy filing, PPL filed its Motion to Assume Ground Lease with this Court in July 2011, whereby PPL sought to assume the Ground Lease with the City—in essence bringing the fight about alleged defaults under the Ground Lease to this Court (PPL Case, dkt# 29). Not unexpectedly, the City vigorously opposed and objected to PPL's effort to assume the Ground Lease in PPL's bankruptcy case (PPL Case, dkt# 36).  In July 2011, PPL also filed its Motion to Assume Tenant Leases with this Court, whereby PPL sought to assume the Shopping Center Lease with 3LM, and stated that 3LM was not in default under the Shopping Center Lease (PPL Case, dkt# 34).

The Court then set a hearing on the merits of the Motion to Assume Ground Lease, and ordered PPL and the City to participate in and attend a mediation of their disputes (PPL Case, dkt# 57). After months of mediation, PPL and the City reached a settlement in May 2012 that is memorialized in the proposed Settlement Agreement which is the centerpiece of the PPL Plan. In short, the proposed Settlement Agreement provides that the City would purchase the Hawkins Plaza from PPL for approximately $2.9 million conditioned upon PPL terminating the Shopping Center Lease with 3LM and evicting 3LM from Hawkins Plaza first. Thus in one sense, through the proposed Settlement Agreement, PPL turned on 3LM after years of defending its tenant 3LM; but in another sense, the proposed Settlement Agreement provided a pool of money for PPL to pay to City Bank, income taxes generated from the sale, and some amount to 3LM as a displaced tenant.

## 3LM Chapter 11 Bankruptcy

The proposed Settlement Agreement with the City and threatened termination by PPL of the Shopping Center Lease with 3LM, precipitated yet another bankruptcy filing—this time by 3LM. 3LM filed Chapter 11 bankruptcy on June 2, 2012 for essentially the same reason that PPL filed bankruptcy a year earlier—in an effort to protect a valuable asset—its Shopping Center Lease with PPL for its business at Hawkins Plaza (3LM Case, dkt# 1). 3LM has been operating as a debtor-in-possession since the filing of its bankruptcy case.

On June 25, 2012, 3LM filed a Motion to Assume the Shopping Center Lease with PPL (3LM Case, dkt# 18). At the Consolidated Hearing, Armstrong testified that 3LM wants to assume the Shopping Center Lease so that 3LM can continue to be a profitable business and to protect his employees. Armstrong testified that 3LM has been a profitable business since soon after it opened. Armstrong estimated that 3LM had close to 30 employees, and some of the employees and their families rely on 3LM as their sole source of income.

Armstrong testified at the Consolidated Hearing that 3LM now pays approximately $4,000 a month in Common Area Maintenance (herein "CAM") charges, which is due mostly to increased security provided by PPL. When 3LM first leased with PPL in 2003, their CAM charges were only approximately $600 a month. Armstrong said that 3LM paid a $3,000 security deposit when 3LM leased at Hawkins Plaza and indicated 3LM would be willing to increase the security deposit to equal 3LM's monthly rent if the Court requires it. Additionally, Armstrong stated—and it was undisputed—that 3LM has always paid rent on time to PPL except once in June 2012 when 3LM had to create a debtor-in-possession account as part of 3LM's bankruptcy, which caused the rent payment to be eight days late. Armstrong stated that he is confident that if these bankruptcy cases are resolved, he will be able to return 3LM to its 2008 profitability level. Armstrong further testified at the Consolidated Hearing that 3LM is willing to do whatever is necessary to be a good business citizen.

At the Consolidated Hearing, Brandt (on behalf of PPL) testified that he did not believe 3LM would be able to perform on the Shopping Center Lease for the remainder of the lease's term because in his opinion the City would continue to send notices of default in an attempt to remove 3LM from Hawkins Plaza.

On behalf of 3LM, Armstrong testified at the Consolidated Hearing that the area surrounding Hawkins Plaza has grown in the past ten years with the expansion of Ft. Bliss, a new shopping mall, a new community college, and a new hotel. Armstrong also said that he was very confident that this continued growth combined with 3LM's current business would enable 3LM to keep making payments on the Shopping Center Lease.

The evidence at the Consolidated Hearing demonstrated that 3LM has not always paid all of its bills and obligations on time. For example, a tax warrant was issued against 3LM in July 2011 (and thereafter paid by 3LM), and an ex-partner and judgment creditor had a writ of execution issued against 3LM in July 2011(which was then paid by 3LM). (PPL Ex. 22, 42). 3LM has not always paid all of its taxes on time (such as personal property taxes and franchise taxes).

At the Consolidated Hearing, PPL's attorneys focused on 3LM's bankruptcy Monthly Operating Reports and yearly Profit and Loss Statements to argue that 3LM's profitability has been decreasing since 2008 (PPL Exs. 13–19). Armstrong admitted that 3LM's profits have decreased since 2008 because of bad publicity 3LM has received based on the neighbors' complaints, and because his wages increased when he added more food to his menu to change 3LM's business model. PPL's attorneys also contended 3LM's profits during its bankruptcy are questionable based on discrepancies in 3LM's Monthly Operating Reports (PPL Ex. 12 and 3LM Ex. 75). When 3LM's bookkeeper, Gallardo, was questioned by PPL as to why the cash on hand at the end of some preceding months in 3LM's monthly operating reports did not match the cash on hand at the beginning of the following month, Gallardo explained that during 3LM's bankruptcy she changed from a cash basis to accrual basis accounting, which caused the numbers to not match up.

**PPL Notice of Default/Termination of Shopping Center Lease**

On November 1, 2012, PPL sent written notice to 3LM that it was terminating the Shopping Center Lease effective November 14, 2012 (the day before the Consolidated Hearing commenced). This notice provided that in addition to numerous minor defaults, 3LM had violated ¶¶4.1, 4.2, and 24.1 of the Shopping Center Lease by failing to timely pay personal property and franchise taxes (PPL Ex. 10). At the Consolidated Hearing, Brandt testified that PPL had the authority to terminate the Shopping Center Lease based on this Court's Order Lifting Stay in the 3LM Case (3LM Case, dkt# 62). Brandt further stated that terminating a tenant's leases is in the ordinary course of PPL's business and that PPL had terminated approximately five or six leases since he began leasing Hawkins Plaza in 1989. However, Brandt testified that he could not recall if PPL had ever terminated a tenant's lease when the tenant consistently paid rent. In addition, when asked by 3LM's counsel whether terminating a lease at Hawkins Plaza happened "pretty rarely," Brandt responded that this was true. At the Consolidated Hearing, Armstrong testified that 3LM was not in default under any provisions of the Shopping Center Lease set forth by PPL in their September 10, 2012 Notice of Default letter to 3LM (PPL Ex. 7). In fact, on October 9, 2012, 3LM sent a detailed written response to PPL that stated 3LM had not violated any TABC or City Code and also had not violated the Shopping Center Lease (3LM Ex. 59).

When asked by the Court, counsel for PPL stated that the only existing monetary defaults by 3LM under the Shopping Center Lease were its past due property taxes and franchise taxes, which was a default under ¶8.3 of the Shopping Center Lease. According to Proofs of Claim filed in the 3LM Case, 3LM owes $11,219 in property taxes to the City and $7,880 in Texas franchise taxes to the Texas Comptroller of Public Accounts (PPL Exs. 45, 52). At the Consolidated Hearing, Armstrong testified that 3LM was currently paying the past due amount of its franchise taxes and 3LM would pay its property taxes.

**PPL Plan**

PPL filed its Third Amended Plan of Reorganization on September 20, 2012, which was subsequently modified (herein "PPL Plan"). In general, the PPL Plan seeks approval of the Settlement Agreement between PPL and the City in May 2012. At the Consolidated Hearing, Brandt emotionally testified that PPL entered into the Settlement Agreement with the City because he wanted to resolve the dispute with the City and was tired of having to defend 3LM for the past four years. The PPL Plan provides for the sale of Hawkins Plaza to the City free and clear of 3LM's leasehold interest under §363 of the Bankruptcy Code and for eviction of 3LM as a tenant at Hawkins Plaza (PPL Case, dkt# 283). Additionally, the PPL Plan offers 3LM the greater of $250,000 or any adequate protection the Court may award under §363(e) of the Bankruptcy Code (PPL Case, dkt# 396). As such, both parties questioned witnesses at the Consolidated Hearing as to the value of 3LM's leasehold interest at Hawkins Plaza for the purposes of adequate protection.

At various points during the Consolidated Hearing, Armstrong (on behalf of 3LM) estimated that it would cost $650,000 and $750,000 to move 3LM's business from Hawkins Plaza, including building a new kitchen with walk-in freezers, constructing a new bar, sprinkler installation, building a new patio, and marketing the new location. Armstrong also stated that 3LM would need approximately six months to move to a new location.

During his testimony regarding the cost of moving locations, Armstrong revealed that approximately four months before the Consolidated Hearing he signed an engagement letter with the landlord of a nearby property located at Montana and Yarbrough, and had placed a $30,000 deposit on the location. Not including any CAM charges, the rent at this location would be approximately $13,000 a month, which would be approximately $3,000 more per month than 3LM pays PPL in rent and CAM charges combined. Armstrong said this possible new location would require significant build-out, including plumbing, electricity, and architectural planning. According to Armstrong, although one side of the new space had been used as a nightclub, the other has been vacant. Armstrong also indicated that while 3LM would be able to move some of its property to this possible new location, 3LM would still have to purchase many new items. Additionally, Armstrong estimated that the possible new location was only 50 to 60% as good as Hawkins Plaza because the area's traffic counts are not as high, there are not as many apartment complexes, and access to the location is more difficult.

Sellers, a real estate appraiser and consultant based in El Paso, testified at the Consolidated Hearing as an expert on behalf of PPL as to the value of the 3LM's leasehold interest. After reviewing the average market rents in the area, Sellers calculated that over the remaining 13-year term of the Shopping Center Lease, 3LM would save $138,970 on its rent and CAM charges if it moved, mainly because of the high CAM charges 3LM currently pays at Hawkins Plaza (PPL Ex. 11). Sellers next calculated that the cost of moving locations would be $39,561, which he arrived at by offsetting the cost of moving and lost profits during the down time until 3LM could reopen—estimated to take only between two weeks and one month—by the average landlord's contribution to tenant improvements (PPL Ex. 11). In total, Sellers testified that moving to a comparable location nearby would save 3LM about $99,409 over the remaining term of the Shopping Center Lease (PPL Ex. 11). Thus, according to Sellers the value of 3LM's leasehold interest was $0.

However, on cross-examination, Sellers admitted that he did not take into account the time, cost, or risk associated with seeking both the bankruptcy court's and the TABC's approval for 3LM to move locations and reapply for a liquor license, and did not include the value of 3LM's business in his calculation. Armstrong (on behalf of 3LM) strongly disagreed with Sellers' assessment of value, stating that Sellers did not understand TABC regulations, how to value a restaurant and bar such as 3LM, or the cost of a move of a restaurant and bar. Armstrong also said that 3LM's location at Hawkins Plaza was a big part of 3LM's value.

15

**3LM Competing Plan**

3LM filed its proposed competing Second Amended Plan of Reorganization for PPL on September 19, 2012 (herein "<u>3LM Competing Plan</u>"). In general, the 3LM Competing Plan provides for the reorganization of PPL, assumption of the Ground Lease with the City and Shopping Center Lease with 3LM, and continued operation at Hawkins Plaza by PPL with monthly payments to City Bank. The 3LM Competing Plan also provides for a Litigation Trust headed by Brandt as the Litigation Trustee, to pursue claims against the City and other persons. During closing arguments, 3LM's attorney admitted that 3LM included the Litigation Trust for leverage against the City.

At the Consolidated Hearing, Brandt unequivocally testified that he was unwilling to act as the Litigation Trustee under 3LM's Competing Plan. Brandt also testified he was unwilling to continue the operations of PPL under the 3LM Competing Plan. However, later Brandt indicated he would continue to operate PPL if he was forced to do so.

# IV.
# LEGAL ANALYSIS AND CONCLUSIONS OF LAW

One of the Contested Matters that is the subject of this Consolidated Opinion arises in the 3LM Case—the Motion to Assume Shopping Center Lease filed by 3LM as debtor. The other Contested Matters that are the subject of this Consolidated Opinion arise in the PPL Case, which are: (1) confirmation of the 3LM Competing Plan for PPL filed by 3LM; (2) confirmation of the PPL Plan filed by PPL; and (3) certain PPL Plan-related Motions, namely—the Motion to Value Leasehold filed by PPL, the 3LM Motion to Strike Ballots, and the PPL Request to Strike Ballots. The Court will analyze each of these Contested Matters in turn.

## A. MOTION TO ASSUME SHOPPING CENTER LEASE—3LM CASE

In the 3LM Case, 3LM is the Chapter 11 debtor. 3LM has filed a Motion to Assume Shopping Center Lease in the 3LM Case (3LM Case, dkt# 18). In general, through this Motion, 3LM (as debtor) seeks to assume the Shopping Center Lease between 3LM (as lessee-tenant) and PPL (as lessor-landlord) under §365 of the Bankruptcy Code. PPL is the only party that has objected to this Motion (3LM Case, dkt# 34, 55, 68, 121). PPL objected to the assumption of the Shopping Center Lease by 3LM on several grounds, including that PPL already terminated the Shopping Center Lease just prior to the Consolidated Hearing. PPL also asserted various defaults in the Shopping Center Lease, and the inability of 3LM to provide adequate assurance of future performance under the Shopping Center Lease.

Through the Joint Pretrial Order (herein "Joint PTO") submitted by PPL and 3LM with respect to the Motion to Assume Shopping Center Lease,  3LM and PPL stipulated to the following facts: (1) that 3LM was current on its monetary obligations to PPL under the Shopping Center Lease as of the date of PPL's bankruptcy petition (May 30, 2011); (2) that on September 10 and 21, 2012, PPL delivered a Notice of Default and Supplemental Notice of Default to 3LM with respect to the Shopping Center Lease (herein "Notices of Default"); and (3) on November 1, 2012, PPL delivered a Notice of Termination to 3LM with respect to the Shopping Center Lease (herein "Notice of Termination") (3LM Case, dkt# 130, p. 12). 3LM and PPL also stipulated in the Joint PTO that the legal issues to be determined with respect to the Motion to Assume Shopping Center Lease are: (1) whether 3LM can assume the Shopping Center Lease with PPL; (2) whether 3LM can cure nonmonetary defaults under the Shopping Center Lease with PPL; and (3) whether 3LM can provide adequate assurance of future performance of the Shopping Center Lease (3LM Case, dkt# 130, p. 24).

## 1. The Pre-Hearing Notice of Termination

On November 1, 2012, PPL sent a written Notice of Termination to 3LM, purporting to terminate the Shopping Center Lease effective November 14, 2012—the day before the hearing on the Motion to Assume Shopping Center Lease was

scheduled to start (PPL Ex. 10). Accordingly, PPL contends that since the Shopping Center Lease has already been terminated, it cannot be assumed by 3LM and the Motion to Assume the Shopping Center Lease filed by 3LM must be denied. In response, 3LM argues that PPL's issuance of the Notice of Termination was outside the ordinary course of PPL's business and PPL (as a debtor in its own bankruptcy case) did not have the required bankruptcy court authorization in PPL's bankruptcy case to issue the Notice of Termination to 3LM (3LM Case, dkt# 128, Ex. D; PPL Case, dkt# 359). The Court agrees that the Notice of Termination of the Shopping Center Lease issued by PPL to 3LM was legally ineffective and was of no force and effect.

PPL is an operating Chapter 11 debtor-in-possession in its own separate bankruptcy case. As such, under §363(c)(1) of the Bankruptcy Code, PPL may engage in transactions within (or "inside") the ordinary course of business of PPL, without prior bankruptcy court approval. *See* 11 U.S.C. §363(c)(1). Conversely, transactions that are "outside" the ordinary course of PPL's business require prior approval of the bankruptcy court (this Court) in PPL's bankruptcy case, after notice and hearing to creditors of PPL and parties in interest. *See* 11 U.S.C. §§363(b)(1), 1107(a), 1108.

To determine whether a transaction was inside or outside a debtor's ordinary course of business, courts have sometimes utilized a "vertical" test and a "horizontal" test. In general, under the vertical test, courts look at whether the transaction subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit. Under the horizontal test, in general courts look at whether the transaction was of the sort commonly undertaken by companies in the industry. The primary focus is on the debtor's pre-petition business practices and conduct. *See e.g., In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 399-400 (Bankr. D. Del. 2011); *In re Media Cent., Inc.*, 115 B.R. 119, 125 (Bankr. E.D. Tenn. 1990). A transaction by a Chapter 11 debtor that is outside the ordinary course of its business and lacks court approval is unenforceable, ineffective, and void. *See e.g., Northview Motors Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 351 (3d Cir. 1999); *In re Lavigne*, 183 B.R. 65, 69 (Bankr. S.D.N.Y. 1995) *aff'd*, 199 B.R. 88 (S.D.N.Y. 1996) *aff'd*, 114 F.3d 379 (2d Cir. 1997) (notice of cancellation of contract by Chapter 11 debtor legally ineffective as outside the ordinary course of business and not approved by bankruptcy court).

Here, PPL's business is operating Hawkins Plaza, which includes leasing to and managing tenants. But the Court must conclude that the issuance of the Notice of Termination of the Shopping Center Lease to 3LM was "outside" the ordinary course of business of PPL. This is because 3LM is PPL's **major** and **largest** rent-paying tenant.[3] 3LM has been operating its business at Hawkins Plaza and timely paying rent and generating substantial revenue for PPL for almost 10 years. For PPL to unilaterally terminate the lease of its major tenant who was paying rent, is not consistent with PPL's pre-bankruptcy business practices and conduct, is not common in the industry, and

---

[3] In contrast, if the tenant had been small (like Monaco, a small potential tenant that had never moved in and never paid rent), the termination would be in the ordinary course of PPL's business.

subjects PPL's creditors to higher economic risk.[4]  At the Consolidated Hearing, Brandt (on behalf of PPL) could not clearly remember terminating any tenant leases in the past when the tenant was paying rent to PPL—and certainly not a major tenant. It is simply not in the ordinary course of business for PPL to terminate the lease of its highest paying and largest tenant 3LM, which would jeopardize the financial viability of Hawkins Plaza and expose PPL's bankruptcy estate to economic risk.   This conclusion is bolstered by the fact that the status of the Shopping Center Lease was in the midst of hotly contested litigation at the time the Notice of Termination was issued. Indeed, the hearing on confirmation of the PPL Plan (which proposes that PPL terminate the Shopping Center Lease), the Competing 3LM Plan (which proposes that PPL assume the Shopping Center Lease), and the Motion To Assume Shopping Center Lease itself—were all scheduled for hearing the very next day after the purported termination of the lease issued by PPL was to be effective.

In issuing the Notice of Termination to 3LM of the lease, PPL (for its part) was undoubtedly relying on this Court's Order Granting Motion for Relief from Automatic Stay entered in the 3LM Case on August 17, 2012 (herein "<u>Order Lifting Stay</u>") (3LM Case, dkt# 62). Although understandable, PPL's reliance on the Order Lifting Stay is misplaced for several reasons. First, the Order Lifting Stay was granted after notice and hearing in the 3LM bankruptcy case, not the PPL bankruptcy case. This is critical because, to obtain bankruptcy court approval of a transaction outside the ordinary course of PPL's business, there must be notice to PPL's creditors and opportunity for hearing in PPL's bankruptcy case on the proposed transaction. And an order approving the transaction would have to be entered in the PPL bankruptcy case. *See* 11 U.S.C. §363(b)(1). None of this occurred. Second, the Order Lifting Stay was granted by the Court under §362(d)(1) of the Bankruptcy Code (which provides for lifting of the automatic stay for cause in 3LM's bankruptcy case), and not under §363(b)(1) of the Bankruptcy Code (which would provide for court authorization of transactions outside the ordinary course of PPL's business in PPL's bankruptcy case). Finally, the Order Lifting Stay was not a determination of the substantive legal right of PPL to terminate the lease with 3LM, but instead was intended to maintain the status quo between the respective bankruptcy estates of PPL and 3LM. *See* Order Lifting Stay, ¶2  (which provides "Nothing contained in this Order . . . shall constitute any finding or determination of whether or not PPL can legally terminate the Shopping Center Lease with 3LM, or the merits of any underlying claims between 3LM and PPL"). In sum, the Court did not approve the issuance by PPL of the Notice of Termination of the lease to 3LM, as would have been required in the PPL bankruptcy case under §363(b)(1) of the Bankruptcy Code for the termination to be legally effective.

For these reasons, the pre-hearing Notice of Termination of the Shopping Center Lease given by PPL to 3LM was outside of the ordinary course of PPL's business and not approved by the Court. As a consequence, the Court concludes that PPL's purported termination of the Shopping Center Lease was legally ineffective.

---

[4] If the Notice of Termination was legally effective (which the Court finds that it was not), it may have exposed PPL's bankruptcy estate and its creditors to a claim by 3LM for wrongful termination of the Shopping Center Lease. Thankfully, that claim exposure has been avoided.

## 2.  Requirements of Assumption of Real Property Lease-§365(b)(1)

Next, the Court will address the substantive merits of the Motion to Assume Shopping Center Lease filed by 3LM (as debtor) in the 3LM bankruptcy case. Section 365 of the Bankruptcy Code governs assumption of unexpired leases, and sets forth several requirements for a debtor (such as 3LM) to assume a nonresidential (commercial) real property lease like the Shopping Center Lease.

In pertinent part, 11 U.S.C. §365(b)(1) sets forth that "If there has been a default in an . . . unexpired lease of the debtor [3LM], the trustee [3LM][5] may not assume such . . . lease unless, at the time of assumption of such . . . lease, the trustee [3LM]—

(A) cures, or provides adequate assurance that the trustee [3LM] will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee [3LM] to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee [3LM] will promptly compensate, a party other than the debtor [PPL] to such . . . lease, for any actual pecuniary loss to such party [PPL] resulting from such default; and

(C) provides adequate assurance of future performance under such . . . lease."

11 U.S.C. §365(b)(1) [added].

The non-debtor party—in this instance PPL—bears the burden of proving a default under the Shopping Center Lease. *See In re F.W. Rest. Associates, Inc.*, 190 B.R. 143, 147 (Bankr. D. Conn. 1995). Because §365(b)(1) uses the phrase "has been a default", it "impl[ies] that the default does not have to be present" at the time of assumption. *See In re Wingspread Corp.*, 116 B.R. 915, 928 (Bankr. S.D.N.Y. 1990). 3LM's admission at the Consolidated Hearing that 3LM has not yet paid its 2011 personal property taxes constitutes a monetary default under ¶8.3 of the Shopping Center Lease, which means that there has been a default in the Shopping Center

---

[5] As a debtor-in-possession in its Chapter 11 case, 3LM has the rights and duties of a trustee. *See* 11 U.S.C. §1107(a).

Lease. Consequently, 3LM must comply with the requirements of §365(b)(1) to assume such lease.

With respect to assumption of a real property lease, courts "should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the [3LM] estate to assume it." [added]. *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1312 (5th Cir. 1985). Here, the evidence at the Consolidated Hearing demonstrated that it would be beneficial for 3LM to assume the Shopping Center Lease, as Hawkins Plaza is 3LM's only business location. If the Shopping Center Lease is not assumed by 3LM but is instead rejected, 3LM would likely be out of business and its employees would lose their jobs, as 3LM would be required to surrender possession of the leased premises. *See* 11 U.S.C. §365(d)(4)(A).

Just because assumption of the Shopping Center Lease would be beneficial to 3LM does not end the inquiry. The debtor (here 3LM) bears the burden of showing that the requirements for assumption under §365 have been met. *In re Texas Health Enterprises Inc.*, 72 Fed. Appx. 122, 126 (5th Cir. 2003); *In re M. Fine Lumber Co., Inc.*, 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008). In substance, §365(b)(1) has four requirements for a debtor (such as 3LM) to assume a nonresidential (commercial) real property lease—such as the Shopping Center Lease: (a) 3LM must cure or provide adequate assurance that it will promptly cure any monetary defaults in the Shopping Center Lease; (b) 3LM must cure any past nonmonetary defaults by performing the nonmonetary obligations contained in the Shopping Center Lease at the time of assumption, because it is a nonresidential real property lease; (c) 3LM must compensate or provide adequate assurance that 3LM will promptly compensate PPL for any pecuniary loss resulting from the 3LM's default; and (d) 3LM must provide adequate assurance of future performance under the Shopping Center Lease. The Court will examine each of these requirements in turn.

### a.  Cure Monetary Defaults-§365(b)(1)(A)

PPL contends that 3LM's failure to pay its 2011 property taxes and 2011 franchise taxes are monetary defaults under ¶¶4.1, 4.2, 8.3, and 24.1 of the Shopping Center Lease (PPL Ex. 2, pp. 2, 6, 14). However, the Court concludes that the only applicable provision here is ¶8.3 of the Shopping Center Lease, which requires 3LM to pay any personal property taxes assessed on 3LM's personal property located at Hawkins Plaza before their due date (PPL Ex. 2, p. 6).

Paragraph 8.3 of the Shopping Center Lease does not encompass franchise taxes, as it is entitled "personal property taxes" and only applies to taxes levied against the personal property of the tenant (3LM) placed at the premises (Hawkins Plaza). Paragraphs 4.1 and 4.2 of the Shopping Center Lease do not require payment of franchise taxes, as again such provisions are limited to compliance with laws, government orders, regulations, and permits regarding 3LM's use of the premises

(Hawkins Plaza) (PPL Ex. 2, p. 2). Simply put, franchise taxes have nothing to do with 3LM's use of the leased premises at Hawkins Plaza. Finally, ¶24.1 of the Shopping Center Lease has no applicability to franchise taxes, as it is a default provision, which refers to payment to any third party required under the Lease (PPL Ex. 2, p. 14). And, just as importantly, in the Joint PTO, PPL stipulated that 3LM was current on its monetary obligations to PPL under the Shopping Center Lease as of May 30, 2011 (the date of PPL's bankruptcy petition) (3LM Case, dkt# 130, p. 12).

As a consequence, the only existing monetary default under the Shopping Center Lease that 3LM must cure is payment of the 2011 personal property taxes (which were due in January 2012) and payment of 2012 personal property taxes (which are due by late January 2013). The failure to pay personal property taxes under a lease is a material default that must be cured. *See e.g., In re Gen. Oil Distribs., Inc.*, 18 B.R. 654, 658 (Bankr. E.D.N.Y. 1982); *In re Rachels Indus., Inc.*, 109 B.R. 797, 811 (Bankr. W.D. Tenn. 1990). Moreover, courts have held that the failure to timely pay real property taxes is a monetary default that the debtor must either cure or provide adequate assurance that it will promptly cure. *See e.g., In re Sterling Mining Co.*, 2009 WL 2589401, at *3 (Bankr. D. Idaho Aug. 21, 2009). In *Sterling Mining*, the lease required the tenant to pay "all ad valorem, property taxes, and other governmental charges applicable to the Property." *Id.* The court held that even though this amount was not payable to the lessor, "the payment of taxes on the leased Property protects the lessor's interest in the property, and is a typical monetary default." *Id.*; *see also Matter of Haute Cuisine, Inc.*, 58 B.R. 390, 393 (Bankr. M.D. Fla. 1986); *In re Rowland*, 292 B.R. 815, 818 (Bankr. E.D. Pa. 2003).

In conclusion, to cure monetary defaults in the Shopping Center Lease, 3LM must promptly pay any outstanding 2011 personal property taxes owed to the City Tax Assessor, which are estimated to be in the amount of about $11,219 according to the Proof of Claim in 3LM Case (PPL Ex. 45). In addition, 3LM must also promptly pay any outstanding 2012 personal property taxes. As such, this Court will authorize and require 3LM to pay any outstanding 2011 personal property taxes and any outstanding 2012 personal property taxes within 30 days to satisfy §365(b)(1)(A).[6]

### b. Nonmonetary Defaults-§365(b)(1)(A)

In the Notices of Default sent to 3LM, PPL asserted various nonmonetary defaults by 3LM under the Shopping Center Lease against 3LM (PPL Ex. 7, 8). These include allegations that 3LM (1) violated occupancy limits under its June 2, 2010 Agreed Order with the TABC; (2) violated ¶4.2 of the Shopping Center Lease because 3LM patrons engaged in fighting, assaults, thefts, and other malfeasances; (3) made major alterations to the premises without proper building permits; (4) violated municipal codes by maintaining an ice-making machine in the alley behind the premises; (5) violated

---

[6] In light of ¶36 of the Shopping Center Lease which provides that 3LM (as tenant) will cure any monetary defaults within 30 days of assumption (PPL Ex. 2, p. 19), the Court finds that payment of the personal property taxes within 30 days is a prompt cure under 11 U.S.C. §365(b)(1)(A).

¶¶4.1 and 4.2 of the Shopping Center Lease by having caused or permitted nuisances at its premises; (6) violated ¶4.2 of the Shopping Center Lease because 3LM annoyed or interfered with the rights of other tenants at Hawkins Plaza; (7) violated §2 of the Shopping Center Lease's Rules & Regulations (herein "Shopping Center Rules") by permitting noise to be heard outside the premises; and (8) violated §3 of the Shopping Center Rules by erecting a satellite dish on its roof (PPL Ex. 7, 8). These constitute alleged defaults by 3LM of "nonmonetary obligations" (known as "nonmonetary defaults") under 11 U.S.C. §365(b)(1)(A).

Significantly, §365(b)(1)(A) provides that if a nonmonetary "default arises from a failure to operate in accordance with a nonresidential real property lease, *then such default shall be cured by performance at and after the time of assumption in accordance with such lease . . . .*" 11 U.S.C. §365(b)(1)(A) (emphasis added). In short, since the Shopping Center Lease is a nonresidential (commercial) real property lease, as long as 3LM is not currently committing a nonmonetary default at the time of assumption, then it is performing under the lease and §365(b)(1)(A) will excuse any previous uncurable nonmonetary defaults. *See* 3 Collier on Bankruptcy, ¶365.06[3][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). As one court explained, through the 2005 amendments to the Bankruptcy Code, Congress provided debtors with limited relief from the obligation to cure nonmonetary prepetition defaults, by adding new language in §365(b)(1)(A) that requires a cure only of defaults other than those "arising from any failure to perform non-monetary obligations under an unexpired lease of real property". *In re Empire Equities Capital Corp.*, 405 B.R. 687, 690 (Bankr. S.D.N.Y. 2009). Simply put, the cure requirement for past nonmonetary defaults under §365(b)(1)(A) is different for real property leases (like the Shopping Center Lease) than it is for non-real property leases (like executory contracts).[7]

Despite the laundry list of nonmonetary defaults PPL alleged against 3LM in the Notices of Default, there was no or insufficient probative evidence that 3LM was currently engaged in any of these nonmonetary defaults now (i.e., at the time of assumption). As detailed above, Armstrong testified that 3LM has taken a number of remedial measures, including hiring security guards, reducing his occupancy levels, and installing sound absorbing material in 3LM to reduce noise. Armstrong testified that 3LM has removed the ice-making machine from the alley.

With respect to 3LM's installation of the satellite dish on the roof, Armstrong testified that he told Brandt he was installing the satellite dish on 3LM's roof way back in 2003. Technically, the installation of a satellite on 3LM's roof may be a violation of §3 of the Shopping Center Rules (PPL Ex. 2, Ex. B, p. 25). But §3 of the Shopping Center Rules did not apparently go into effect until November 2005, when the Shopping Center Lease (with the Shopping Center Rules attached) was executed; and the 3LM satellite

---

[7] For example, if the Shopping Center Lease was not a real property lease, then any past incurable nonmonetary defaults by 3LM would result in the contract not being assumable in bankruptcy. *See In re Escarent Entities, L.P.*, 423 Fed. Appx. 462, 465 (5th Cir. 2011) (where the Fifth Circuit held that §365 precludes assumption of a contract—which was not a real property lease—if a nonmonetary default is incurable).

dish was already on the roof in 2005. Further, §12 of the Shopping Center Rules provides that "The Landlord (PPL) reserves the right to amend, rescind, or waive any of the rules or regulations" (PPL Ex. 2, Ex. B, p. 27). Brandt testified that PPL knew 3LM had a satellite on their roof, although he did not know when it was first installed. So, PPL knew that 3LM installed a satellite dish on their roof that has been there since 2003 and the installation pre-dated the Shopping Center Lease and Shopping Center Rules. PPL chose not to remove the satellite dish as PPL was entitled to do under §3 of Shopping Center Rules. PPL did not even raise this alleged technical default until 2012 in an effort to create a reason to terminate the lease. Accordingly, the Court concludes that §3 of the Shopping Center Rules does not apply, or alternatively, that PPL waived §3 prohibiting the installation of satellite dishes.[8]

With respect to PPL's allegation that 3LM is a nuisance, the 2011 TABC Order, entered by an Administrative Law Judge after hearing, found that 3LM was not a common nuisance (PPL Ex. 36). Just as importantly, there was no probative evidence presented at the Consolidated Hearing that 3LM was currently a nuisance, or of any current noise violations or complaints from other tenants about 3LM, or of any recent or existing over occupancy of the 3LM premises.

In this respect, this Court must base its decision on the evidence presented at the Consolidated Hearing. The Court may not base its decision on speculation about what neighbors, tenants, or the City may think, or alleged events occurring in the past that were not demonstrated to the Court during the Consolidated Hearing.

Instead, the evidence presented to the Court demonstrated that 3LM is not in nonmonetary default under the Shopping Center Lease. For example, Mejia testified that while she worked for the City from 2008 to 2010 she was not aware of any City Code violations committed by 3LM. Likewise, Armstrong testified that 3LM had never violated any City Codes or regulations and had never been cited for a violation by City police or firefighters. Armstrong stated 3LM had already paid its tax warrant and the judgment in favor of Cartwright, and that 3LM would pay its 2011 property and franchise taxes. Armstrong further stated that 3LM was not in default of any provision of the Shopping Center Lease mentioned in PPL's September 10, 2012 Notice of Default letter to 3LM and had not violated any TABC regulations. The recent PFD from an Administrative Law Judge in November 2012 corroborated many of Armstrong's contentions as it did not recommend cancellation of 3LM's liquor license based on alleged TABC violations (3LM Ex. 42, p. 21). Specifically, the Administrative Law Judge found that "the evidence [did] not prove [3LM] conducted [their] business in a manner in violation of the general welfare, health, peace, morals of the people and public sense of decency" (3LM Ex. 42, p. 20).

In determining that there are no nonmonetary defaults under the Shopping Center Lease that must be cured by 3LM, the Court must also apply some evidentiary weight to the admissions made by PPL in a prior pleading filed with this Court. In its

---

[8] Indeed, it is hard to imagine a sports bar and restaurant that would not have a satellite dish installed at its business.

Motion to Assume Tenant Leases filed on July 29, 2011, whereby PPL sought to assume the Shopping Center Lease with 3LM in the PPL bankruptcy case, PPL stated "all Tenants [which includes 3LM] are complying with the non-monetary Terms of their separate Leases with the Debtor [PPL]." (PPL Case, dkt# 34) [added]. Prior inconsistent pleadings are admissions, but they are not conclusive admissions and are controvertible. *See The Limited, Inc. v. McCrory Corp.*, 683 F.Sup. 387, 395 n. 5 (S.D.N.Y. 1988) (citing *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984)). PPL has attempted to controvert and explain away its prior admissions by stating in a later pleading filed on July 20, 2012, that "though *Patriot's* position *vis-à-vis* 3LM during the initial phase of Patriot's Chapter 11 proceeding was aligned with *3LM*, the discovery conducted by Patriot relating to the pending *Motions to Assume Commercial Leases* has uncovered evidence of *3LM's* conduct which resulted in *Patriot* taking steps to terminate 3LM's Lease" (3LM Case, dkt# 55, p. 5). Despite this attempted explanation, the Court must still give some evidentiary weight to PPL's prior admission that 3LM was complying with the non-monetary terms of the Shopping Center Lease.[9]

In sum, based on the evidence presented at the Consolidated Hearing,  3LM is currently performing its nonmonetary obligations under the Shopping Center Lease and is not currently engaged in any nonmonetary defaults, and thus 3LM has complied with this requirement for assumption under §365(b)(1)(A).

### c.  Compensate for Pecuniary Loss- §365(b)(1)(B)

Section 365(b)(1)(B) also requires that a debtor-lessee (3LM) compensate the other party (PPL) for any "actual pecuniary loss" suffered by the other party (PPL) resulting from any default by the debtor-lessee (3LM) under the Shopping Center Lease. Notably, this particular requirement of assumption was not specifically identified by the parties in the Joint PTO as one of the legal issues to be determined in this proceeding (3LM Case, dkt# 130, p. 24).

On this point, the evidence presented at the Consolidated Hearing was spotty and inconclusive at best. PPL appeared to exclusively rely on the Proof of Claim in the amount of $380,000 that it filed against 3LM in 3LM's bankruptcy case (PPL Ex. 50). 3LM filed an objection to such Proof of Claim (3LM Case, dkt# 146), and based on the evidence presented at the Consolidated Hearing by 3LM, the Proof of Claim is not

---

[9] 3LM has argued that that the doctrine of "judicial estoppel" completely precludes PPL from now taking the position that 3LM is in default under the Shopping Center Lease. The Court does not believe that judicial estoppel applies here. One of the necessary elements to apply judicial estoppel is that the Court have "accepted" PPL's prior inconsistent position. *See Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261, 267 (5th Cir. 2012); *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 294 (5th Cir. 2004) (judicial acceptance requires that the court adopted the position previously urged by a party, whether as a preliminary matter or as part of a final disposition). The Court never "accepted" PPL's prior inconsistent position that 3LM was complying with the non-monetary terms of the lease—as the Court has not ruled on the Motion to Assume Tenant Leases filed by PPL.

entitled to prima facie validity.[10] Such Proof of Claim has a one-page list of "costs" relating to 3LM, consisting in large part of attorneys fees incurred by PPL and multiple other smaller and largely unsubstantiated costs relating primarily to the Hawkins Plaza parking lot. Armstrong testified that PPL had never sent a bill or invoice to 3LM for such costs. At the Consolidated Hearing, PPL provided very little probative evidence connecting the dots between the amount and basis of the costs set forth by PPL in the Proof of Claim and the 3LM defaults that allegedly caused the costs, which is necessary to make them recoverable under the Shopping Center Lease.

On its face, the Proof of Claim filed by PPL against 3LM is based on the indemnification provisions in the Shopping Center Lease (PPL Ex. 50, p. 1). The Shopping Center Lease has three indemnification provisions (PPL Ex. 2, ¶¶8.5, 8.11, and 38). Based on the evidence presented at the Consolidated Hearing, the indemnity provision of ¶8.11 does not appear to apply—as this provision relates primarily to claims and liabilities asserted against Landlord (PPL) on account of injuries to persons or damage to property caused by Tenant (3LM) or its invitees. The indemnity provision of ¶38 also does not appear to apply based on the evidence presented at the Consolidated Hearing—as this provision relates primarily to reimbursing Landlord (PPL) for any fines or costs due to non-compliance by Tenant (3LM) with codes and laws relating to alterations or repairs to the interior of the leased premises.

The only indemnity provision that may possibly apply is set forth in ¶8.5 of the Shopping Center Lease, which provides in relevant part that "In case any action or proceeding is brought against Landlord (PPL) by reason of any act of Tenant (3LM), or of its licensees, invitees, contractors, agents or employees, Tenant (3LM), *upon notice from Landlord (PPL)*, shall defend the same at Tenant's (3LM's) expense by counsel reasonably satisfactory to Landlord (PPL), and shall indemnify Landlord (PPL) against any cost, expenses or judgment arising from such proceeding." (PPL Ex. 2, p. 7) (emphasis added). Based on this provision, PPL claims that 3LM owes PPL for PPL's attorneys fees it incurred in disputes with the City and neighbors as a result of 3LM's actions, as well as for expenses that PPL undertook to increase parking at Hawkins Plaza. However, ¶8.5 requires PPL to provide notice to 3LM and provide 3LM with the opportunity to defend any such proceeding before 3LM will be liable to indemnify PPL for any costs and expenses of PPL arising from such proceeding. There was insufficient evidence that PPL ever provided the required notice to 3LM first under this (or any other) indemnity provision. Armstrong testified that 3LM had never received PPL's December 8, 2011 letter that PPL alleged provided 3LM notice of their indemnity claim. Even if 3LM did receive this December 8, 2011 letter, PPL did not request (or even mention) indemnity or a request for 3LM to defend PPL—instead the letter requests that 3LM comply with TABC orders (PPL Ex. 5).

Although the Court could see how it could (possibly) be proven that PPL has

---

[10] *See* 11 U.S.C. §502(a); Bankruptcy Rule 3001(f); *McGee v. O'Connor (In re O'Connor)*, 153 F.3d 258, 260 (5th Cir. 1998) (if the debtor (here 3LM) presents sufficient evidence to overcome the prima facie effect of a filed proof of claim, the burden shifts to creditor (here PPL) to prove the validity of claim).

suffered actual pecuniary loss recoverable from 3LM under §365(b)(1)(B), the simple fact of the matter is that no actual pecuniary loss was established by the evidence presented at the Consolidated Hearing. Perhaps tellingly, after the Consolidated Hearing, PPL filed a Notice of Withdrawal of the Proof of Claim it filed against 3LM in the amount of $380,000 and an Agreed Order was entered withdrawing the Proof of Claim, which was the basis for the alleged actual pecuniary loss (3LM Case, dkt# 176, 181).

For these reasons, the Court must conclude that for the purpose of assumption of the Shopping Center Lease by 3LM, there are no actual pecuniary losses that must be compensated by 3LM under §365(b)(1)(B) of the Bankruptcy Code.

### d. Adequate Assurance of Future Performance- §365(b)(1)(C)

Much of the controversy here is over the requirement that 3LM provide "adequate assurance of future performance" by 3LM under the Shopping Center Lease as provided by §365(b)(1)(C) of the Bankruptcy Code. In essence, §365(b)(1)(C) seeks to "balance the debtor's interest in maximizing the value of its estate through the assumption and assignment of its executory leases against the landlord's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred." *In re Embers 86th St., Inc.*, 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

The requirement of a debtor to establish adequate assurance of future performance for lease assumption under §365(b)(1)(C) is not as demanding as the plan confirmation requirement that a plan of reorganization be feasible under §1129(a)(11). Assumption of a nonresidential (commercial) real property lease by a debtor often must happen relatively early in a Chapter 11 case due to the time limits set by §365(d)(4)(A), in comparison to the length of time necessary to propose and confirm a Chapter 11 plan of reorganization. Indeed, courts have held that a debtor need not prove that it will "thrive and make a profit" or provide an "absolute guarantee of performance" to meet the adequate assurance requirement of §365(b)(1)(C); instead, it must appear that the rent will be paid and other lease obligations will be met by the debtor. *See e.g., Fine Lumber*, 383 B.R. at 573 (citing *In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 755 (Bankr. S.D.N.Y. 1986)).

According to the Fifth Circuit, what constitutes adequate assurance of future performance is "extremely fact-specific." *In re Texas Health Enterprises Inc.*, 72 Fed. Appx. 122, 126 (5th Cir. 2003). Factors the Fifth Circuit has used in assessing whether a debtor has provided adequate assurance of future performance under a lease include (1) whether the debtor's financial data indicates its ability to generate an income stream sufficient to meet its obligations; (2) the general economic outlook in the debtor's industry; and (3) the presence of a guarantee. *Id.* (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir. 1985)). Additional factors that courts have examined include (1) the debtor's payment history; (2) presence of a security deposit; (3) evidence of profitability; (4) plan that would earmark money exclusively for

the landlord; and (5) whether the unexpired lease is at, or below, the prevailing rate. *See e.g.*, *Fine Lumber*, 383 B.R. at 573.

In specifically examining the facts, 3LM has always paid its monthly rent and CAM charges on time to PPL under the Shopping Center Lease—that is, for over seven straight years. The only late monthly rent payment was in June 2012, when 3LM first filed bankruptcy and was in the process of setting up a new required debtor-in-possession account. The monthly rent under the Shopping Center Lease is currently about $6,000, with the rent to gradually increase by a few hundred dollars a month annually until the final five years of the lease when the rent will remain at approximately $8,600 (PPL Ex. 2, Ex. E). According to Armstrong, the CAM charges paid by 3LM are about $4,000 a month, which is relatively high because of the parking lot security provided. The stated term of the Shopping Center Lease is 20 years, having commenced in 2005 and set to expire in the year 2025 (PPL Ex. 2, p. 2). Armstrong has personally guaranteed the Shopping Center Lease (PPL Ex. 2, Ex. D). There is a relatively small security deposit ($3,000) under the Shopping Center Lease, which 3LM indicated it would be willing to increase if required by the Court.

Although the general economic outlook of the sports restaurant/bar industry is difficult to gauge, Armstrong testified that the area surrounding 3LM was continuing to grow. Hawkins Plaza and 3LM's establishment is located at a busy intersection at Hawkins and Montana Avenue that has effectively become central (and no longer East) El Paso. 3LM's establishment is relatively close to Fort Bliss, a major mall, golf courses, and the El Paso Airport, and is adjacent to apartment complexes that Armstrong testified provide customers for 3LM. It was apparent from the evidence that 3LM has a very popular (and perhaps too popular) establishment given the number of patrons it attracts, which in the past has created parking and disturbances around the adjacent neighborhood. Finally, it appears that 3LM's rent may be below the prevailing market rate even when its relatively high CAM security charges at Hawkins Plaza are taken into account, compared to the possible rent at a potential different location at Montana Avenue and Yarbrough that 3LM has been tentatively exploring.

The evidence established that 3LM appeared to have been a steady income stream and fairly profitable business for several years prior to its bankruptcy filing. For example, the annual Profit and Loss Statements submitted at the Consolidated Hearing show that 3LM had a net profit of about $182,000 and gross revenues of about $1.4 million in the year 2006, net profit of about $158,000 and gross revenues of about $2.1 million in the year 2007, net profit of about $365,000 and gross revenues of about $2.4 million in the year 2008, net profit of about $156,000 and gross revenues of about $2.1 million in the year 2009, net profit of about $105,000 and gross revenues of about $1.6 million in the year 2010, and net profit of about $59,000 and gross revenues of about $1.4 million in the year 2011 (PPL Ex. 13). It appears that 3LM did not file bankruptcy due to any specific financial catastrophe, instead 3LM filed bankruptcy in an effort to protect its Shopping Center Lease from being terminated and to preserve its business at Hawkins Plaza.

On the other hand, these Profit and Loss Statements demonstrate a decline in revenue and profit by 3LM since a peak in 2008. Armstrong explained that this in part was a result of 3LM changing its business focus to more of a restaurant than a bar, higher wages necessary to support a dining establishment, reducing its occupancy level due to parking limitations and the TABC, and increased security expense—all undertaken in an effort to remedy complaints about 3LM's establishment. The evidence also showed that 3LM has not always paid all of its bills and obligations on time. For example, a tax warrant was issued against 3LM (and thereafter paid by 3LM), and an ex-partner and judgment creditor had a writ of execution issued against 3LM (which was then paid by 3LM).[11] 3LM has not always paid all of its taxes on time (such as personal property taxes and franchise taxes).

It is also apparent that 3LM has been and still is under the watchful eye of the TABC. 3LM's business is the subject of various Orders entered by the TABC. 3LM's liquor license has been challenged. To date, 3LM has successfully maintained its liquor license, as demonstrated by the recent November 5, 2012 SOAH Proposal for Decision (herein "PFD") in which an independent Administrative Law Judge denied the TABC's request to cancel 3LM's liquor license (3LM Ex. 42). Although this PFD is not yet final, the decision resolved the TABC's complaints against 3LM in 3LM's favor. If and when the PFD becomes final, the TABC will not be able to relitigate these past issues with 3LM.  3LM's maintenance of its liquor license is obviously critical to its continued operations, as alcohol sales still constitute a significant percentage of its gross revenues.

Post-bankruptcy, 3LM's profitability is less clear. Although its Monthly Operating Reports filed with the Court continue to show a steady income stream and positive cash flow, questions were raised at the Consolidated Hearing (that went largely unanswered) about the accuracy of some of the figures on the Monthly Operating Reports given 3LM's apparent change to accrual-based accounting. 3LM has also amassed significant professional and legal fees during its bankruptcy case totaling about $272,000—none of which have yet been paid by 3LM or approved by the Court (3LM Case, dkt# 172). Nonetheless, the evidence clearly showed that 3LM has continued to timely pay its post-bankruptcy rent and CAM charges to PPL under the Shopping Center Lease.

With regard to 3LM's past problem with the City and some neighbors, 3LM provided evidence that the parking situation, which is apparently (and understandably) the source of much of the neighborhood problems with 3LM, is no longer as much of a problem because of Hawkins Plaza's current tenant mix. 3LM is the only significant tenant at Hawkins Plaza that is open on a regular basis at night, when the parking requirements of 3LM's patrons is the highest. In addition, 3LM has taken steps to reduce noise at its establishment, provide additional security, reduce its occupancy and

---

[11] However, it is not unusual (and in fact is common) for a Chapter 11 debtor to have had financial difficulties in timely paying its debts. If this alone were grounds for not authorizing a Chapter 11 debtor to assume a lease, then rarely could a Chapter 11 debtor ever assume a lease in Chapter 11—which is certainly not what is intended by §365(b)(1). *See also* 11 U.S.C. §365(b)(2)(A).

move to a more restaurant-based establishment.

No neighbors were called to testify by any party regarding any complaints about 3LM at the Consolidated Hearing, even though some were listed as potential witnesses. And no City officials were called to testify regarding any complaints about 3LM at the Consolidated Hearing, even though some were listed as potential witnesses. The Court cannot speculate on what neighbors or the City might or might not have testified to regarding 3LM, instead it must rule based on the evidence provided at the Consolidated Hearing.

Of all the factors, the Court finds one of the most important has been 3LM's excellent rental payment history. Indeed, one court has even held that the debtor's "virtually flawless" history of paying rent satisfied the adequate assurance of future performance requirement, even where the debtor had not been profitable for over a year. *See In re Natco Indus., Inc.*, 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985). Although this Court may not go that far, the simple fact remains that 3LM has always met its rent obligations under the Shopping Center Lease and has been historically profitable.

Other courts have employed a relatively low threshold for a debtor to show adequate assurance of future performance to be able to assume an unexpired lease. For example, some courts have employed a "more probable than not" test to hold that the debtor had proved adequate assurance of future performance so that it could assume the leases in question. *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999); *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

Here, the specific facts presented at the Consolidated Hearing provide support for allowing 3LM to assume the Shopping Center Lease because 3LM has proven adequate assurance of future performance. Assumption of the Shopping Center Lease is essential for 3LM to have the opportunity to successfully reorganize, 3LM does have sufficient funds to promptly cure the only monetary default under the Shopping Center Lease (personal property taxes), and 3LM has proven that it is more probable than not it can meet its obligations under the Shopping Center Lease in the future.

This is not to say that 3LM has not had any financial difficulties or that this is not a close call for the Court. Despite its apparent profitability and consistent payment of monthly rent, the record demonstrates that 3LM has had problems making payments on other obligations. Armstrong admitted that 3LM has not yet paid its 2011 personal property and franchise taxes, although it is now making payments on the latter. As outlined above, at various points 3LM has also owed beverage taxes, had a tax warrant issued, and a money judgment executed against it. Additionally, as detailed above, 3LM has had a long running fight with the City, certain neighbors, and the TABC over its establishment at Hawkins Plaza. 3LM is far from being "out of the woods" in its bankruptcy case at this point.

This Court concludes that, although these problems are not insignificant, they do not prevent 3LM from assuming the Shopping Center Lease. If this Court did not allow a

Chapter 11 debtor who has had some financial difficulty to assume a critical lease where its sole business establishment is located, then few Chapter 11 debtors in bankruptcy would ever be allowed to assume a lease and have the opportunity to successfully reorganize.

For any and all of these reasons and specific facts, 3LM has established "adequate assurance of future performance" under the Shopping Center Lease as required by §365(b)(1)(C) of the Bankruptcy Code.

### 3. Additional Requirements for Shopping Center Lease- §365(b)(3)

As Hawkins Plaza is a shopping center, 3LM must satisfy the additional adequate assurance requirements with respect to the Shopping Center Lease with PPL that are set forth in §365(b)(3) of the Bankruptcy Code. Notably, these particular requirements of assumption were not specifically identified by PPL and 3LM in the Joint PTO as legal issues to be determined in this proceeding (3LM Case, dkt# 130, p. 24).

Section 365(b)(3) provides that "adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;[12]

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center."

11 U.S.C. §365(b)(3).

3LM's assumption of the Shopping Center Lease does not implicate §§365(b)(3)(B) and (D) because there is no percentage rent due and there was no evidence presented that 3LM's continued presence in Hawkins Plaza would disrupt the

---

[12] The second part of §365(b)(3)(A) only applies to assignments of leases, and here no assignment (only assumption) of the Shopping Center Lease is being sought.

current tenant mix or balance in Hawkins Plaza. As for §365(b)(3)(A)'s requirement that the debtor (3LM) provide adequate assurance of the source of rent and other consideration due under the lease, 3LM has met this requirement by consistently paying its rent and CAM charges to PPL over the past ten years, seven years of which was under the Shopping Center Lease. 3LM has also shown that it should continue to generate sufficient revenue to pay its obligations under the Shopping Center Lease. And as to the first requirement in §365(b)(3)(C), it has been satisfied as 3LM's assumption of the Shopping Center Lease is subject to all of the provisions of the Shopping Center Lease.

As to the second requirement in §365(b)(3)(C)—that the assumption of the Shopping Center Lease "will not breach any such provision contained in any other lease . . . or master agreement  relating to such shopping center (Hawkins Plaza)"—an objection could perhaps have been raised that the assumption of the Shopping Center Lease would breach the Ground Lease for Hawkins Plaza between PPL and the City. However, this objection was not raised by PPL (the only objecting party), is not set forth in the Joint PTO, and the City did not join the issue by filing an objection to the Motion to Assume the Shopping Center Lease in the 3LM Case. No evidence was presented at the Consolidated Hearing that any provision of the Ground Lease would be breached by assumption of the Shopping Center Lease by 3LM. Instead (and understandably), both PPL and 3LM's witnesses at the Consolidated Hearing testified that they did not believe that there was a default under the Ground Lease with the City. For the limited purpose of §365(b)(3)(C) in the 3LM Case, the Court finds that such requirement has been satisfied by 3LM. The Motion to Assume Ground Lease filed by PPL in the PPL Case is contested by the City and has not been adjudicated due to the pending Settlement Agreement proposed in the PPL Plan. Accordingly, that issue—whether the Ground Lease with the City may be assumed by PPL—will remain for another day.

In the meantime, for the reasons stated above and for the reasons stated by the Court with respect to 3LM's satisfaction of the "adequate assurance" requirement of §365(b)(1)(C) above, the Court concludes that 3LM has satisfied the additional adequate assurance requirements with respect to the Shopping Center Lease that are set forth in §365(b)(3) of the Bankruptcy Code

### 4. Conclusion

In conclusion, although this situation presents a complex set of facts that makes this Court's decision a close call, the Court finds that that the Motion to Assume the Shopping Center Lease filed by 3LM will be granted for the reasons set forth above. This decision is based largely on 3LM's excellent rental payment history, its past profitability and continued income stream, its compliance with nonmonetary obligations at the time of assumption, and the disastrous consequences to 3LM's business if the Motion to Assume the Shopping Center Lease were denied. In granting the Motion to Assume the Shopping Center, the Court will require and authorize 3LM to pay the outstanding 2011 and 2012 personal property taxes within 30 days to cure the monetary default under the Shopping Center Lease.

### B. CONFIRMATION OF 3LM COMPETING PLAN—PPL CASE

Shifting gears, the Court will now turn to the PPL Case where PPL is the Chapter 11 debtor. In the PPL Case, 3LM filed its Second Amended Competing Plan for PPL on September 19, 2012 (PPL Case, dkt# 275) and a Plan Amendment on November 14, 2012 (PPL Case, dkt# 358) (collectively herein "3LM Competing Plan").  3LM sought confirmation of the 3LM Competing Plan at the Consolidated Hearing.

### 1. Summary of 3LM Competing Plan

In general, the 3LM Competing Plan contemplates the reorganization of PPL. PPL would continue to operate Hawkins Plaza, and 3LM would continue as PPL's tenant. To that end, the 3LM Competing Plan provides for "deemed" assumption and cure by PPL of both the Ground Lease between PPL and the City and the Shopping Center Lease between 3LM and PPL in the PPL Case. The 3LM Competing Plan also proposes to create a "Litigation Trust" with Brandt (the principal of PPL) to be appointed as Litigation Trustee to pursue alleged claims against the City, City officials, neighbors, and others, with the expense of such Litigation Trust to be funded by PPL (PPL Case, dkt# 276-2, Ex. B; 345).

The 3LM Competing Plan has literally no support from any creditors of PPL or parties in interest in the PPL Case; only 3LM (such Plan's proponent) supports the 3LM Competing Plan. PPL, the City, City Bank, the U.S. Trustee[13] and Monaco all filed Objections to the 3LM Competing Plan (PPL Case, dkt# 315, 319, 320, 321, 323, 325, 326). In general, such Objections contend that the 3LM Competing Plan cannot be confirmed because such Plan (1) is not feasible; (2) improperly attempts to "deem" the Ground Lease with the City and the Shopping Center Lease with the City as being cured and assumed by PPL; (3)   contains an unnecessary and wasteful Litigation Trust that is not proposed in good faith; (4) improperly classifies claims; and (5) is not proposed in good faith.

According to the 3LM Competing Plan Ballot Summary filed with the Court, only one alleged creditor (Paul Johnson) voted to accept the 3LM Competing Plan. But Mr. Johnson is not eligible to vote—he is not a creditor of PPL as he has not filed a proof of claim, he was not scheduled as a creditor, and his ballot was cast late and after the Plan voting deadline (PPL Case, dkt# 327, pp. 6-7). Two votes were cast rejecting the 3LM Competing Plan, one by PCD I Ltd. and one by PCD II Ltd., which are affiliates of PPL (PPL Case, dkt# 327, pp. 4-5). So, no creditor validly voted to accept the 3LM Competing Plan, and the only proper ballots voted to reject the 3LM Competing Plan.

For the following reasons, the Court concludes that confirmation of the 3LM Competing Plan must be denied at the present time in its present form.

---

[13] The U.S. Trustee's Limited Objection to the 3LM Competing Plan was later withdrawn based on a Plan Amendment (PPL Case, dkt# 315).

**2. The 3LM Competing Plan is not feasible at this time- §1129(a)(11)**

For a court to confirm a plan of reorganization, the plan must meet the feasibility requirement codified in §1129(a)(11) of the Bankruptcy Code. This section requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor [PPL] . . . ." 11 U.S.C. §1129(a)(11); *see also In re Save Our Springs (SOS) Alliance Inc.,* 632 F.3d 168, 172 (5th Cir. 2011). Essentially, this confirmation requirement concerns whether the debtor can realistically make the plan work. *See In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989). In determining plan feasibility, the Fifth Circuit has identified the following factors: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. However, there is no requirement that the Court consider all six of these factors. See *Save Our Springs,* 632 F.3d at 172.

Furthermore, though a guarantee of success is not required, the bankruptcy court should be satisfied that the reorganized debtor can stand on its own two feet under the proposed plan. See *Lakeside Global,* 116 B.R. at 506 (citing *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988)). Speculative, conjectural, or unrealistic projections cannot support a debtor's prediction of future performance. *See e.g., Save Our Springs,* 632 F.3d at 172; *In re Canal Place Ltd. Partnership*, 921 F. 2d 569, 579 (5th Cir. 1991).

Here, PPL has uncertain future earning power to fund the 3LM Competing Plan mainly because at this point, 3LM—PPL's major tenant that pays the most rent—is currently in its own bankruptcy proceeding and 3LM's ability to successfully reorganize remains in question. 3LM has yet to file or propose a plan of reorganization in its own bankruptcy case, which means it is still uncertain whether 3LM will be able to successfully emerge from bankruptcy and if it does, whether it will still be located as an operating business at Hawkins Plaza. This 3LM uncertainty directly affects PPL and the viability of the 3LM Competing Plan, because if 3LM is not able to successfully exit Chapter 11 with an operating business, then PPL would most likely no longer be a profitable business and the 3LM Competing Plan would likely fail. Without 3LM as Hawkins Plaza's anchor tenant, other tenants who have leases for much shorter terms (and at smaller rent) than 3LM may not want or be able to continue as tenants of PPL in Hawkins Plaza.  Additionally, without the monthly rent and CAM charges 3LM pays to PPL, PPL may not be able to meet its rent obligations under the Ground Lease and its debt service to City Bank. If PPL cannot comply with the Ground Lease including making the monetary payments thereunder (which escalate over time), the City may well seek to terminate the Ground Lease—as it sought to do before PPL's bankruptcy— and then PPL may go out of business. And if PPL cannot make its monthly debt service to City Bank as proposed in the 3LM Competing Plan, then it is likely City Bank would move to foreclose on Hawkins Plaza and PPL may go out of business.

The ability of 3LM to successfully reorganize in its separate bankruptcy proceeding (and thereby provide major rent funding to PPL required by the 3LM Competing Plan) remains in doubt at this point in time for multiple reasons. Nothing of substance has occurred in the 3LM bankruptcy case since it was filed in June 2012, other than 3LM successfully litigating its way to assuming the Shopping Center Lease with PPL in the 3LM bankruptcy case. No plan has been filed by 3LM in its bankruptcy case. Multiple professionals have been hired by 3LM in its bankruptcy case (three sets of lawyers, an accountant and a bookkeeper) which have amassed fees and expenses over the 6 months of its bankruptcy totaling about $272,000 (3LM Case, dkt# 172). These professional fees have not yet been paid by 3LM or approved by the Court, but to the extent they are approved, would constitute administrative priority claims that 3LM would have to pay to successfully emerge from its own bankruptcy proceeding. And it is likely that 3LM will continue to accrue significant professional administrative fees, given its apparent penchant for litigation and appeal. Meanwhile, creditors of 3LM have filed Proofs of Claim against 3LM in its bankruptcy case totaling over $1 million, which includes over $138,000 in priority claims by various tax authorities (3LM Case, claims register).[14] In addition, 3LM has over $153,000 in pre-bankruptcy debt and only $84,000 in assets according to its Bankruptcy Schedules filed with the Court (3LM Case, dkt# 20, p. 16).

Pre-bankruptcy, the Profit and Loss Statements of 3LM demonstrate a steady stream of income, yet a decline in revenue and profit by 3LM since 2008 (PPL Ex. 13). The statement for the most recent pre-bankruptcy year (2011) shows a net profit of only about $58,000. Although 3LM had an adequate reason for its decline in revenue and profitability, the fact remains that its profitability appears to be in decline. Post-bankruptcy, 3LM's profitability is less than clear. Although its Monthly Operating Reports filed with the Court continue to show a steady income stream and positive cash flow, questions were raised at the Consolidated Hearing (that went largely unanswered) about the accuracy of some of the figures on the Monthly Operating Reports given 3LM's apparent change to accrual-based accounting. 3LM also remains under the eye of the TABC, and its business is subject to several TABC Orders. To date, 3LM has successfully defended and maintained its liquor license, but that decision was not yet final as of the time of the Consolidated Hearing. 3LM's maintenance of its liquor license is obviously critical to its successful reorganization, as alcohol sales still constitute a significant percentage of its gross revenues. Simply put, 3LM is not out of the wood yet in its own bankruptcy case, and to confirm the 3LM Competing Plan in PPL's case based on 3LM's successful emergence from bankruptcy would be speculative at this point.

In considering PPL's capital structure, PPL is a single asset real estate (SARE) debtor. Its primary asset is the Hawkins Plaza. Although PPL owns the improvements at Hawkins Plaza, the underlying real estate is subject to the Ground Lease between the City (as lessor) and PPL (as lessee). The City has sought to terminate the Ground

---

[14] The Court recognizes that 3LM has recently objected to and disputes several of these Proofs of Claim, but at this point in time such objections are not resolved.

Lease, and has vigorously challenged PPL's attempt to assume the Ground Lease in the PPL Case. The PPL Plan and related Settlement Agreement with the City that would resolve this raging Ground Lease dispute, has been successfully derailed by 3LM for the reasons set forth later in this Consolidated Opinion. The Ground Lease cannot be deemed "assumed" and "cured" by 3LM on behalf of PPL as contemplated by the 3LM Competing Plan for the reasons set forth below. City Bank is owed about $1.4 million by PPL, which is secured by Hawkins Plaza. The 3LM Competing Plan cannot and does not fix the problem and dispute with the City over the Ground Lease. This Ground Lease uncertainty also makes the 3LM Competing Plan infeasible at this point in time.

With respect to feasibility factors of the ability and continuation of PPL management, the 3LM Competing Plan proposes that PPL's current management (Brandt) remain in control of PPL. However, Brandt testified at the Consolidated Hearing that he may not want to continue as the management of PPL if the Court confirmed the 3LM Competing Plan. Although there is no indication that PPL's management is not capable of successfully operating Hawkins Plaza, the relationship between PPL's management and 3LM has deteriorated at this point, and it is uncertain if such relationship can be repaired.

For any and all of these reasons, the Court to concludes that, at this point in time, the 3LM Competing Plan is not feasible under 11 U.S.C. §1129(a)(11) and cannot be confirmed.

### 3. The proposed Litigation Trust is wasteful, is not proposed in good faith, and does not provide adequate means for its implementation- §§1129(a)(3), 1123(a)(5)

Section 1129(a)(3) of the Bankruptcy Code also requires that a plan be proposed in "good faith". 11 U.S.C. §1129(a)(3). According to the Fifth Circuit, the "good faith" plan requirement is viewed in light of the "totality of circumstances surrounding establishment of the proposed plan", and the bankruptcy court is in the "best position" to assess the good faith of such plan proposal. *See e.g., Mabey v. Southwestern Elec. Power Co., (In re Cajun Elec. Coop., Inc.)*, 150 F.3d 503, 519 (5th Cir. 1998)(supporting citations omitted). Section 1123(a)(5) of the Bankruptcy Code provides that a plan shall "provide adequate means for the plan's implementation." 11 U.S.C. §1123(a)(5). The absence of an adequate means of implementation can also demonstrate a lack of good faith thereby precluding confirmation of the plan of reorganization. *See Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1003 (E.D. Va. 1994).

Here, the 3LM Competing Plan provides for the creation of a "Litigation Trust" (PPL Case, dkt# 275, 276-1, Ex. B). The expense and operation of this Litigation Trust proposed by 3LM is to be paid and funded by PPL as follows: $50,000 up front as an initial payment by PPL to the Litigation Trust, and then up to $20,000 incremental payments by PPL upon request (with apparently no set ceiling on the amount of funding imposed upon PPL for the Litigation Trust). The stated purpose of this Litigation Trust proposed by 3LM is to investigate and pursue alleged causes of action against the City,

its Mayor and City representatives, neighbors surrounding Hawkins Plaza, and other unnamed persons. Any recoveries by the Litigation Trust would be paid largely to 3LM on account of an alleged post-petition damage claim against PPL. 3LM has proposed that Brandt (the principal of PPL) be appointed as the Litigation Trustee to bring these alleged causes of action for the Litigation Trust (PPL Case, dkt# 345).

This particular Litigation Trust is not proposed by 3LM in good faith. In essence, 3LM is trying to force PPL (and its unwilling principal Brandt) to sue the City and other individuals for the primary benefit of 3LM, using virtually an unlimited amount of PPL's money. Nothing in this record indicates that any of these alleged causes of action have any monetary value. Indeed, 3LM's counsel admitted at closing arguments that the real purpose of the Litigation Trust was to provide "leverage" against the City. 3LM has a history of bringing suit against City officials and neighbors, which have been summarily dismissed in state court according to Armstrong (PPL Ex. 38, 39). This Court will not tolerate needless and wasteful litigation, proposed to be funded by a Chapter 11 debtor (PPL) against the wishes of both the Chapter 11 debtor (PPL) and creditors of the Chapter 11 debtor.  The Court finds that the proposed Litigation Trust is unnecessary, wasteful of PPL's assets, and when viewed in the totality of circumstances, is not proposed in good faith by 3LM as part of the 3LM Competing Plan.[15]

The Litigation Trust also does not provide adequate means for its implementation. 3LM has proposed that Brandt (the principal of PPL) be appointed as the Litigation Trustee to bring these alleged causes of action for the Litigation Trust (PPL Case, dkt# 345). However, Brandt testified at the Consolidated Hearing that he would not serve as the Litigation Trustee for the Litigation Trust proposed by 3LM.  In theory, the Court could appoint a Litigation Trustee, but what kind of individual would be willing to serve under these circumstances? For these reasons, the 3LM Competing Plan with accompanying Litigation Trust does not provide adequate means for its implementation.

### 4.  Improper "Deemed" Assumption and Cure of Ground Lease by PPL

The 3LM Competing Plan provides, in part, for the "deemed" assumption and cure by PPL of any defaults under the Ground Lease between the City and PPL (PPL Case, dkt# 275, pp. 13, 23; dkt# 358, p. 4). Here, 3LM is basically attempting to short-cut the pending and separate contested matter between the City and PPL regarding assumption of the Ground Lease, over the objection of both the parties to the Ground Lease (the City and PPL).

In this very peculiar situation, the Court finds a case from the Bankruptcy Court for the District of Kansas instructive. *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10 (Bankr. D. Kan. 2001). In *Valley View,* a shopping center's landlord and a debtor-lessee of commercial space within the shopping center proposed competing plans of

---

[15] The Court is certainly not condemning all Litigation Trusts, which have become somewhat common in many plans of reorganization. This Litigation Trust proposed by 3LM goes over the edge however, under the circumstances of this case.

reorganization. The landlord's competing plan provided for assumption of the debtor-lessee's ground lease with the landlord so that the landlord could sell the leasehold interest as part of its plan. *Id.* at 39-40. The *Valley View* court did not allow the landlord's plan to be confirmed because it held that "under §365(a), the trustee or debtor in possession has the discretion to assume or reject the lease. No creditor or other party in interest may force the debtor to assume a lease under §365. And, unless the debtor or trustee assumes the lease in accordance with §365, neither the debtor nor trustee can assign or sell the lease. . . ." *Id.* The *Valley View* court  recognized that "although §1123(b)(2) authorizes the assumption and assignment of unexpired leases under a plan, this is subject to §365(b), which endows the debtor in possession or the trustee with the exclusive right and power to assume the lease, so that it can be assigned." *Id.*; *see also Cont'l Country Club, Inc. v. Burr (In re Cont'l Country Club, Inc.)*, 114 B.R. 763, 765 (Bankr. M.D. Fla. 1990) ("the right to assume or reject an executory contract is limited to a debtor-in-possession"); *In re G. Force Investments, Inc.*, 442 B.R. 646, 649 (Bankr. N.D. Ohio 2010) ("whether the estate should seek to assume or reject an executory contract or lease lies within the sole discretion of the trustee or the debtor-in-possession").[16]

Here, the Ground Lease between the City and PPL has been hotly disputed and is the subject of a pending unresolved separate contested matter in this Court. To summarize, on July 26, 2011, PPL filed a Motion to Assume Ground Lease, whereby PPL sought to assume the Ground Lease between PPL, as lessee, and the City, as lessor (PPL Case, dkt# 29). In August and September 2011, the City filed substantial Objections to PPL's Motion to Assume Ground Lease, whereby the City contended that the Ground Lease could not be assumed and should be terminated, primarily based on the activities of 3LM (PPL Case, dkt# 36, 41, 62). On August 18, 2011, City Bank filed a Response and Joinder, supporting PPL's Motion to Assume Ground Lease (PPL Case, dkt# 39).   At these parties' request, the Court entered a Scheduling Order on September 8, 2011 with respect to the Motion to Assume Ground Lease (PPL Case, dkt #57). Such Scheduling Order set a hearing on the merits for December 16, 2011 on the Motion to Assume Ground Lease, and ordered PPL, the City, and City Bank to participate in mediation in an effort to resolve their disputes over the Ground Lease.

Due to the length of the mediation, and at the request of these parties, the Court amended and extended various deadlines in the Scheduling Order.   The mediation culminated in the Settlement Agreement between the City and PPL which proposes to resolve the Ground Lease dispute, approval of which is being sought through the PPL

---

[16] On the other hand, one court has disagreed with the decision in *Valley View,* and concluded that a creditor may assume or reject an executory contract or unexpired lease in a plan of reorganization. *See In re Nickels Midway Pier, LLC,* 452 B.R. 156, 161 (D.N.J. 2011). This case involved competing plans from the debtor-landlord who owned an amusement park pier and a lessee that operated a water park on the pier. *Id.* at 158. The court approved the lessee's plan, even though it provided for the assumption of a contract of sale agreed to by the debtor that sold the debtor's pier to the lessee. *Id.* at 158–59.

Plan. As a result of the pending settlement, PPL and the City ceased the pending litigation in the contested matter regarding assumption of the Ground Lease.  And the Court continued the hearing on the merits on the Motion to Assume Ground Lease so that approval of the Settlement Agreement could be sought from the Court through a Plan of Reorganization proposed by PPL, which became the PPL Plan (PPL Case, dkt# 161).

Under these particular circumstances, it is procedurally improper and unfair for the Court to permit 3LM to attempt to short-cut this pending and unresolved contested matter regarding assumption of the Ground Lease, by 3LM merely "deeming" the Ground Lease assumed and all defaults cured through the 3LM Competing Plan.  The parties to the pending and unresolved contested matter involving assumption of the Ground Lease (the City, PPL, and City Bank) do not support and have objected to the 3LM Competing Plan. The City has specifically objected to this attempted short-cut procedural maneuver by 3LM through the 3LM Competing Plan (PPL Case, dkt# 319, pp. 2-4; dkt# 325, pp. 3-4). PPL and City Bank have also objected and taken the position that the 3LM Competing Plan is not confirmable because it ignores and cannot resolve the pending Ground Lease litigation with the City (PPL Case, dkt# 320, pp. 1-3; dkt# 323, p. 2).

In this very peculiar situation, the Court does not believe that a competing plan of reorganization filed by a tenant (3LM) should be able to bypass the pending dispute between a debtor (PPL) and its ground lessor (the City) over the Ground Lease. For procedural and substantive due process, the issues involved in the pending and unresolved contested matter regarding assumption of the Ground Lease must have its own evidentiary hearing. As it stood at the beginning of the Consolidated Hearing (which included seeking confirmation of the 3LM Competing Plan and PPL Plan), both PPL and the City were attempting to avoid this litigation and settle the Ground Lease dispute by extinguishing the Ground Lease and selling Hawkins Plaza to the City under the Settlement Agreement.

Accordingly, based on the heavily disputed and separate pending contested matter regarding assumption of the Ground Lease, to preserve procedural and substantive fairness and due process, and the rationale employed by the court in *Valley View* in this very unique situation, the Court concludes that the Ground Lease cannot be "deemed" assumed and all defaults cured through the 3LM Competing Plan. So, confirmation of the 3LM Competing Plan must be denied.

## 5. Conclusion

In conclusion, confirmation of the Competing 3LM Plan must be denied for the reasons set forth above: (1) the 3LM Competing Plan is not feasible at this time and does not comply with §1129(a)(11) of the Bankruptcy Code; (2) the Litigation Trust proposed in the 3LM Competing Plan is wasteful, is not proposed in good faith, does not provide adequate means for its implementation, and does not comply with  §§1129(a)(3) and 1123(a)(5) of the Bankruptcy Code; and (3) the 3LM Competing Plan provides for a

procedurally and substantively improper "deemed" assumption and cure of the Ground Lease by PPL. Accordingly, it is not necessary or advisable for the Court to address the other objections raised to confirmation of the 3LM Competing Plan, particularly given the girth of this Consolidated Opinion.

## C.  CONFIRMATION OF PPL PLAN—PPL CASE

The Court will now remain with the PPL Case where PPL is the Chapter 11 debtor. In the PPL Case, PPL filed a Third Amended Plan of Reorganization, as modified by such First, Second and Third Preconfirmation Modifications (PPL Case, dkt# 283, 348, 367, 396) (collectively herein "PPL Plan").  PPL sought confirmation of the PPL Plan at the Consolidated Hearing.

### 1.  Summary of PPL Plan

In substance, the PPL Plan filed by PPL is a liquidating plan as it provides for the sale of Hawkins Plaza (the primary asset of PPL) free and clear of all interests, including the leasehold interest of 3LM. The centerpiece of the PPL Plan is the proposed Settlement Agreement between PPL and the City, which is incorporated into the PPL Plan. Court approval of such Settlement Agreement is sought through confirmation of the PPL Plan by the Court.

In general, the PPL Plan provides for: (1) the sale of Hawkins Plaza to the City by PPL for $2.9 million, free and clear of all liens, claims and encumbrances (including free and clear of any leasehold interest of 3LM); (2) assignment of all of PPL tenant leases at Hawkins Plaza to the City, with the exception of the "undesired" tenant leases of 3LM and Monaco; (3) termination of the 3LM Shopping Center Lease between PPL (as landlord) and 3LM (as tenant) at Hawkins Plaza by PPL, and vacating the leased premises at Hawkins Plaza by 3LM; (4) escrow of an additional $100,000 to be paid by the City, with such escrowed funds to be paid to 3LM and/or Monaco upon final resolution of their claims if 3LM and/or Monaco release the City from all claims; (5) distribution of the sale proceeds of $2.9 million to be received by PPL and other funds of PPL to pay (a) property taxes on Hawkins Plaza, (b) principal and interest (but not attorney's fees) owed by PPL to secured creditor City Bank, (c) professional fees incurred by PPL (as discounted), (d) federal income taxes and state franchise taxes estimated to be incurred by PPL from the sale, (e) tenant deposits, (f) the few unsecured creditors of PPL, (g) the disputed claim of 3LM as more fully described below, (h) a cash reserve for the disputed claim of Monaco, and (i) any remaining balance to equity holders/owners of PPL; and (6) a release and exculpation of non-debtors as more fully described below (PPL Case, dkt# 283, 348, 367, 396, 397).

City Bank, certain other tenants of Hawkins Plaza, and certain unsecured creditors, all voted to accept the PPL Plan. 3LM voted to reject the PPL Plan. *See* PPL Plan Ballot Summary filed with the Court (PPL Case, dkt# 328). Although the City did not vote on the PPL Plan, the City supports confirmation of the PPL Plan and approval

of the Settlement Agreement that is included in the PPL Plan (PPL Case, dkt# 399). Limited objections to confirmation of the PPL Plan were filed by the City of El Paso Tax Assessor and the U.S. Trustee, which were later withdrawn (PPL Case, dkt# 313, 316).

Significant objections to confirmation of PPL Plan were filed by 3LM (PPL Case, dkt# 324, 395, 401). 3LM asserts a multitude of objections, including that (a) PPL cannot sell Hawkins Plaza to the City free and clear of 3LM's leasehold interest, as none of the statutory conditions for such a sale are met under §363(f) of the Bankruptcy Code; (b) PPL must either assume or reject the Shopping Center Lease with 3LM under §365 and §1123(b) of the Bankruptcy Code in the PPL Plan, but the PPL Plan does neither; (c) it is not possible to value the leasehold interest of 3LM under the Shopping Center Lease and for PPL to provide adequate protection to 3LM as required under §363(e) of the Bankruptcy Code; (d) the PPL Plan was not proposed in good faith, is not feasible, does not provide adequate means for its implementation, violates the absolute priority rule, would cause the PPL estate to be administratively insolvent, and violates public policy and state law; (e) the classes of creditors voting to accept the PPL Plan (City Bank and tenants whose leases are assumed) are not impaired under §1124 of the Bankruptcy Code, and thus their votes cannot be counted as an accepting impaired class necessary for confirmation of the PPL Plan under §1129(a)(10); and (f) the PPL Plan contains improper non-debtor releases and injunctions which violate the Bankruptcy Code and Fifth Circuit precedent. Monaco also filed an objection to confirmation of the PPL Plan (PPL Case, dkt# 322).[17] Monaco objected to the PPL Plan on various grounds, including that the PPL Plan contains improper non-debtor releases and injunctions.

For the two reasons set forth below (and with considerable regret), the Court has concluded that it must deny confirmation of the PPL Plan.

## 2. The PPL Plan does not comply with the sale "free and clear" conditions of §363 of the Bankruptcy Code

The PPL Plan (with incorporated Settlement Agreement) seeks to sell Hawkins Plaza to the City "free and clear" of any leasehold interest of 3LM under its Shopping Center Lease with PPL, under §363(f) of the Bankruptcy Code (PPL Case, dkt# 283, pp. 11–12). PPL recognizes that in connection with any such free and clear sale, PPL must provide "adequate protection" to 3LM under §363(e) of the Bankruptcy Code if required. PPL takes the position in its Plan that the Shopping Center Lease with 3LM has been validly terminated by PPL, and moreover, that the value of 3LM's leasehold interest for adequate protection purposes is negative according to its expert witness. Nonetheless, PPL proposes in the PPL Plan to pay 3LM the greater of (a) $250,000, or (b) such amount of adequate protection as determined and ordered by the Court. *See* Third Preconfirmation Modification to Third Amended Plan filed by PPL (herein "Third PPL

---

[17] The Court notes that recently (on January 8, 2013), PPL and Monaco filed a Motion to approve a settlement which would apparently resolve their disputes (PPL Case, dkt# 402). However, if such settlement with Monaco is approved, 3LM's objections to the PPL Plan would still remain.

Plan Modification") (PPL Case, dkt# 396, pp. 2–4).[18]

3LM vehemently objects to the sale of Hawkins Plaza to the City free and clear of 3LM's leasehold interest created by the Shopping Center Lease, and asserts that none of the conditions contained in §363(f) of the Bankruptcy Code have been satisfied by PPL that would authorize such a §363 sale. Unfortunately, based on the facts and circumstances of this case, the Court must agree with 3LM's objection in this respect.

Section 363(f) of the Bankruptcy Code sets forth five alternative conditions that must be satisfied for the Court to authorize a debtor (like PPL) to sell its property (like Hawkins Plaza) free and clear of interests of third parties (like 3LM). In pertinent part, §363(f) of the Bankruptcy Code provides as follows:

(f) The trustee (PPL)[19] may sell property (Hawkins Plaza) . . . free and clear of any interest in such property of an entity (3LM) other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity (3LM) consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest (the leasehold interest of 3LM) is in bona fide dispute; *or*
(5) such entity (3LM) could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest (the leasehold interest of 3LM).

*See* 11 U.S.C. §363(f) (added).

In short, if a debtor (like PPL) can satisfy one of the five different conditions set forth in the subsections of §363(f), a debtor can sell its property (like Hawkins Plaza) free and clear of all interests of a third party (like 3LM). PPL did not set forth which one of the five different conditions of §363(f) it was relying on to authorize the sale of Hawkins Plaza free and clear of 3LM's leasehold interest, until closing arguments when the Court specifically asked the question. PPL then advised the Court that it was relying on the conditions set forth in §363(f)(4) and/or §363(f)(5) to justify the sale free and

---

[18] PPL makes several other very laudable changes through the Third PPL Plan Modification, including increasing the minimum amount of payment to 3LM from $100,000 to $250,000, granting 3LM an extended period of time to vacate Hawkins Plaza, permitting 3LM to remove furniture, fixtures and equipment from the leased premises, and discounting the amount of professional fees of PPL's counsel.

[19] PPL is a debtor-in-possession in its Chapter 11 case, and thus has the rights of a "trustee" for the purpose of selling property of its bankruptcy estate. *See* 11 U.S.C. §1107(a).

clear. Accordingly, the Court will begin its analysis with these subsections of §363(f).

Section 363(f)(4) authorizes a sale free and clear of an interest, if such interest is in "bona fide dispute". Here, the "interest" in question is the leasehold interest of 3LM at Hawkins Plaza created by the Shopping Center Lease between PPL (as landlord) and 3LM (as tenant). The phrase "bona fide dispute" is not defined in the Bankruptcy Code. In the context of §363(f)(4), many courts have defined "bona fide dispute" as when there is an objective basis for a factual or legal dispute as to the validity of the asserted interest. *See e.g.*, *In re Nicole Energy Services, Inc.*, 385 B.R. 201, 229 (Bankr. S.D. Ohio 2008); *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996) (supporting citations omitted); *see also Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 221 (5th Cir. 1993) (in the context of §303(b)(1) of the Bankruptcy Code,  holding that a bona fide dispute exists if there is an objective basis for a factual or legal dispute as the validity of a debt).

Here, it is not possible for the Court to now conclude that there is a "bona fide dispute" under §363(f)(4) as to the validity of 3LM's leasehold interest on an objective basis. Given the Court's ruling above that 3LM has cured and can promptly cure any defaults in the Shopping Center Lease with PPL, that 3LM's Motion to Assume Shopping Center Lease will be granted, and that PPL's purported notice of termination to 3LM of the Shopping Center Lease was legally ineffective, there is no bona fide dispute remaining as to the validity of 3LM's leasehold interest. For this reason, the Court has always viewed the Motion to Assume Shopping Center Lease filed by 3LM in the 3LM Case as critical to PPL's efforts to confirm the PPL Plan proposed in the PPL Case.[20]  Accordingly, the sale of Hawkins Plaza by PPL free and clear of 3LM's leasehold interest cannot be granted under §363(f)(4) of the Bankruptcy Code, as there is no "bona fide dispute" as to the leasehold interest of 3LM.

The other subsection of §363(f) relied upon by PPL to authorize a sale free and clear of 3LM's leasehold interest is §363(f)(5). In general, §363(f)(5) permits a sale free and clear of an interest of another party, if the other party (here 3LM) could be compelled in a legal or equitable proceeding to accept a money satisfaction for its interest (here 3LM's leasehold interest). PPL filed no brief and cited no legal authorities for the proposition that 3LM could be compelled in a legal or equitable proceeding to accept money for its leasehold interest in Hawkins Plaza under §363(f)(5).

Nothing in the Shopping Center Lease with PPL that creates 3LM's leasehold interest indicates that 3LM could be compelled to accept money for its leasehold interest at Hawkins Plaza. To the contrary, there is a specific provision in the Shopping Center Lease that governs what happens to the Shopping Center Lease if Hawkins Plaza is sold by PPL. Section 21 of the Shopping Center Lease between PPL and 3LM

---

[20] *If* the Motion to Assume Shopping Center Lease had been denied by the Court (which it  was not), then  3LM's leasehold interest would have been in "bona fide dispute" and the sale of Hawkins Plaza free and clear of 3LM's interest under the PPL Plan could have been authorized under §363(f)(4). Then the PPL Plan might have been confirmable if the non-debtor release/exculpation provisions had been removed.

has a provision entitled "Sale of Premises by Landlord", which provides as follows:

> In the event of any sale of the Premises (Hawkins Plaza) by Landlord (PPL), Landlord (PPL) shall be and is entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission occurring after the consummation of such sale; and the purchaser (the City), at such sale or any subsequent sale of the Premises shall be deemed, without any further agreement between the parties (PPL and 3LM) or their successors in interest or between the parties and such purchaser (the City), to have assumed and agreed to carry out any and all of the covenants and obligations of the Landlord (PPL) under this Lease.

*See* Shopping Center Lease (PPL Ex. 2, p. 13) (added).

In substance, this provision of the Shopping Center Lease states that if PPL sells Hawkins Plaza, then the purchaser of Hawkins Plaza (the City under the proposed PPL Plan and related Settlement Agreement) will assume and carry out all covenants and obligations of the landlord (PPL) under the Shopping Center Lease, which would certainly include the covenant and obligation to allow 3LM to occupy the premises that it has leased at Hawkins Plaza. In light of this Lease provision, and the lack of any legal authority cited by PPL to support a conclusion that 3LM could be compelled to accept money in satisfaction of its leasehold interest, the Court concludes that the sale of Hawkins Plaza by PPL free and clear of 3LM's leasehold interest cannot be granted under the condition set forth in §363(f)(5) of the Bankruptcy Code.

Perhaps PPL is relying upon the case it has cited by the Seventh Circuit in *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC, (In re Qualitech Steel Corp.)* 327 F.3d 537 (7th Cir. 2003) (herein "*Qualitech*") to support a sale under §363(f)(5). But the *Qualitech* decision did not address which of the five conditions in §363(f) supported a sale free and clear of a leasehold interest, and certainly did not hold that §363(f)(5) authorized such a sale. *See Qualitech*, 327 F.3d at 546 (where the Seventh Circuit stated that the "parties before us do not dispute that at least one of those conditions" specified under §363(f) for a sale was satisfied, and accordingly the Circuit "will assume" that one or more of the statutory criteria under §363(f) were met). Here, there is a dispute as to which of the conditions of §363(f) have been met, as 3LM directly objects and argues that none of the conditions for a sale free and clear under §363(f) have been satisfied by PPL. Thus, *Qualitech* cannot be relied upon to support a sale under the condition set forth in §363(f)(5).

This Court's conclusion that §363(f)(5) does not support the sale of Hawkins Plaza free and clear of 3LM's leasehold interest in this particular case, is buttressed by decisions of other bankruptcy courts. For example, in the case of *In re Haskell L.P.*, 321 B.R. 1, 9 (Bankr. D. Mass. 2005), the court found that the debtor's tenant could not be compelled to accept money in satisfaction of its leasehold interest, and thus a sale free and clear of the leasehold interest on the basis of §363(f)(5) could not be approved. The

*Haskell* court expressly rejected the debtor's argument that a theoretical eminent domain proceeding could compel the tenant to accept a money satisfaction for its leasehold interest.

In the case of *South Motor Co. v. Carter-Pritchett-Hodges, Inc. (In re MMH Auto. Group, LLC)*, 385 B.R. 347, 370–72 (Bankr. S.D. Fla. 2008), the court found that a debtor's tenant could be compelled to accept money in satisfaction of its leasehold interest under §363(f)(5), because the lease at issue had a contractual "buy-out provision". The buy-out provision in the lease stated that the debtor-lessor could buyout the tenant's interest in and terminate the lease for payment of $60,000. 385 B.R. at 371. The *MMH Automotive* court concluded that since the tenant had contractually agreed in the lease to the buy-out that monetized the value of its leasehold interest, the statutory condition of §363(f)(5) had been satisfied and the sale free and clear of the leasehold interest was properly authorized. *Id.* at 372. In stark contrast to the lease at issue with the buy-out provision in the *MMH Automotive* case, the Shopping Center Lease between PPL and 3LM has no such buy-out provision. Instead, Section 21 of the Shopping Center Lease has the exact opposite—as it basically provides that any purchaser of Hawkins Plaza will carry out and perform all obligations and covenants of PPL under such Lease, which would include the covenant to allow 3LM to continue to occupy the premises that 3LM has leased at Hawkins Plaza. For these reasons, the Court concludes that the sale of Hawkins Plaza by PPL free and clear of 3LM's leasehold interest cannot be granted under the condition set forth in §363(f)(5) of the Bankruptcy Code.

In theory, there are three other statutory conditions in §363(f), which if one was satisfied, could authorize a sale of Hawkins Plaza by PPL free and clear of 3LM's leasehold interest. The Court will only briefly address such other conditions, since they are not apparently relied upon by PPL to support the sale. Section 363(f)(1) basically authorizes a sale free and clear of interests if applicable nonbankruptcy law (usually state law) would permit such sale free and clear of such interest. Here, §363(f)(1) does not apply to authorize a sale free and clear of 3LM's leasehold interest, given Section 21 of the Shopping Center Lease described above and the Court's ruling with respect to 3LM's Motion to Assume the Shopping Center Lease. Next, §363(f)(2) authorizes a sale free and clear of interests, if the entity owning the interest consents to the sale. Here, 3LM has not consented to the sale of Hawkins Plaza free and clear of its leasehold interest and has instead vigorously objected to such sale; thus this condition has not been satisfied. Finally, §363(f)(3) basically authorizes a sale free and clear if the interest is a lien; this subsection has no applicability because 3LM's leasehold interest is not a lien.

So based on the current state of affairs, the Court is at a loss as to which of the five conditions of §363(f) have been satisfied which would authorize a sale of Hawkins Plaza free and clear of 3LM's leasehold interest as proposed in the PPL Plan. The Court has no choice but to conclude that none of the five statutory conditions of §363(f) have been satisfied by PPL that would authorize a sale of Hawkins Plaza free and clear of 3LM's leasehold interest.

PPL seems to rely primarily, if not exclusively, on the Seventh Circuit decision in *Qualitech* to support confirmation of the PPL Plan and the sale of Hawkins Plaza to the City free and clear of 3LM's leasehold interest. However, as already explained by the Court above, the *Qualitech* decision did not address which of the five conditions in §363(f) supported a sale free and clear of a leasehold interest, as the parties in *Qualitech* did not dispute that at least one of the statutory conditions of §363(f) was satisfied. *Qualitech*, 327 F.3d at 546.

PPL cites *Qualitech* for the legal proposition that §363(f) authorizes a sale of property by a lessor-debtor free and clear of a lessee-tenant's leasehold interest, as long as the lessee-tenant requests and is granted "adequate protection" for its leasehold interest under §363(e). 327 F.3d at 547–48. Using this legal proposition, PPL argues that it can sell Hawkins Plaza free and clear of 3LM's leasehold interest, as PPL will pay adequate protection to 3LM for its leasehold interest under the PPL Plan of at least $250,000 or the amount of adequate protection ordered by the Court.

Setting aside for the moment that PPL has not satisfied any of the five conditions of §363(f) necessary to sell Hawkins Plaza free and clear of 3LM's leasehold interest and that the *Qualitech* decision does not address the satisfaction of any of such five statutory conditions, the Court concludes that the *Qualitech* decision does not apply to the proposed sale of Hawkins Plaza as currently presented in the PPL Plan. In *Qualitech*, the Seventh Circuit dealt with a sale by a lessor-debtor free and clear of a lessee-tenant's leasehold interest, where the lessee-tenant (who had notice of the sale) did not object to the sale or the order of the bankruptcy court approving the sale to the purchaser free and clear of the lessee-tenant's leasehold interest. 327 F.3d at 541. The dispute found its way to the Seventh Circuit only when the purchaser subsequently locked out the lessee-tenant, and post-sale litigation proceeded in bankruptcy court as to whether the lessee-tenant's possessory interest in the leased premises was extinguished by the sale. In contrast, in our case 3LM (the lessee-tenant) has and is timely objecting to the proposed sale of Hawkins Plaza by PPL free and clear of its leasehold interest from the outset, not in a post-sale context regarding whether its mere possessory interest has been extinguished like the lessee-tenant in *Qualitech*.

Most importantly, the issue addressed by the Seventh Circuit in *Qualitech* was whether a sale order issued under §363(f) (which sold property free and clear of a lessee-tenant's lease from the debtor) extinguished the lessee-tenant's possessory interest, or whether §365(h) (which provides protection to the lessee when a lease is rejected) trumped the free and clear sale order. 327 F.3d at 543. In essence, the Seventh Circuit in *Qualitech* was faced with what it perceived as a possible conflict between the statutory provisions of §363(f) of the Bankruptcy Code and the provisions of §365(h) of the Bankruptcy Code. But no such statutory conflict presently exists in the instant controversy between PPL and 3LM. Section 365(h) of the Bankruptcy Code— which created the statutory conflict in *Qualitech*—basically provides that if a debtor-lessor **rejects** a real property lease, the lessee-tenant can remain in possession of the leased premises notwithstanding the rejection of the lease. *See* 11 U.S.C.

46

§365(h)(1)(A)(ii); *Qualitech*, 327 F.3d at 547 (§365(h) focuses on a specific type of event—the "rejection" of an executory contract). In our case, PPL has not sought to "reject" the Shopping Center Lease with 3LM; indeed PPL has specifically and emphatically stated that it is <u>not</u> "rejecting" the Shopping Center Lease with 3LM under §365. *See* Third PPL Plan Modification (PPL Case, dkt# 396, p. 2); PPL Third Amended Plan (PPL Case, dkt# 283, p. 27).[21] Furthermore, as stated above, PPL has not established that any of the five condition under §363(f) authorizing a sale free and clear have been met. Accordingly, since PPL is not seeking to "reject" the Shopping Center Lease with 3LM under §365 and PPL has not met any of the sale free and clear conditions under §363(f), the basic holding in *Qualitech* resolving any potential statutory conflict that a sale free and clear under §363(f) trumps a lessee's rejection rights under §365(h) does not even come into play in our case.

As both PPL and 3LM have correctly pointed out, the Seventh Circuit's holding in *Qualitech* has not been followed by several other courts. *See, e.g., In re Samaritan Alliance, LLC*, 2007 WL 4162918, at *4 (Bankr. E.D. Ky. Nov. 21, 2007); *In re Haskell L.P.*, 321 B.R. 1, 10 (Bankr. D. Mass. 2005); *In re Churchill Properties III, Ltd. P'ship*, 197 B.R. 283, 288 (Bankr. N.D. Ill. 1996); *In re Taylor*, 198 B.R. 142, 167 (Bankr. D.S.C. 1996). Some of these courts have refused to follow the *Qualitech* decision partly due to the practical impossibility of determining the amount and type of adequate protection that must be provided under §363(e) to a displaced lessee-tenant; and to this point the Court can sympathize based on the record in these Contested Matters between PPL and 3LM. *See e.g., Haskell,* 321 B.R. at 9–10 (finding that lessee-tenant's losses if displaced from leased premises were incapable of calculation based on the record, and adequate protection under the circumstances could only be achieved by lessee-tenant's continued occupation of leased premises). Notably, the Fifth Circuit has yet to address the issue presented in *Qualitech.* This Court sees no reason to foray and decide whether or not the *Qualitech* decision should be followed or not in this case. This is because none of the statutory conditions of §363(f) have been satisfied by PPL in the first place that would authorize a sale of Hawkins Plaza free and clear of 3LM's leasehold interest, and the issue is not ripe because PPL is expressly <u>not </u>rejecting the Shopping Center Lease with 3LM under §365(h) which would create the controversy presented and decided in *Qualitech.*

In sum, the Court must conclude that based on the facts and circumstances of this particular case as presented, none of the statutory conditions of §363(f) have been satisfied by PPL that would authorize a sale of Hawkins Plaza free and clear of 3LM's leasehold interest. Confirmation of the PPL Plan (which is based on the sale of Hawkins Plaza to the City free and clear of 3LM's leasehold interest) must therefore be denied,

---

[21] To be clear, what PPL seeks through the PPL Plan is to "terminate" the Shopping Center Lease with 3LM, and not to "reject" such Lease. As the Fifth Circuit has recognized, the words "termination" and "rejection" of a lease have different meanings under §365 of the Bankruptcy Code. *See Eastover Bank for Sav. v. Sowashee Venture (In re Austin Dev. Co.)*, 19 F.3d 1077, 1082–83 (5th Cir. 1994). For the reasons set forth above in the Court's ruling on the Motion to Assume Shopping Center Lease, PPL's attempted termination of the Shopping Center Lease with 3LM was not legally effective.

as it does not comply with §363(f)  and §1129(a)(1) of the Bankruptcy Code.[22]

### 3.  The PPL Plan contains improper non-debtor releases and non-debtor exculpations under Fifth Circuit precedent, and cannot be confirmed.

The Third Amended PPL Plan filed by PPL initially contained four different third-party injunctions and releases in favor of non-debtors (PPL Case, dkt# 283, pp. 12, 20, 21, 22). Both 3LM and Monaco have objected to the PPL Plan as containing improper third party non-debtor releases and injunctions (PPL Case, dkt# 324, 322, 401). PPL removed one of the third party injunctions from the PPL Plan (the injunction prohibiting suits against the principals of PPL) through its Second Preconfirmation Modification to its Third Amended Plan (PPL Case, dkt# 367). Three third-party injunctions and releases in favor of non-debtors (including the City) remained in the PPL Plan, which the Court addressed with PPL and the City at closing arguments on December 11, 2012. The Court warned PPL and the City that the three remaining third-party non-debtor injunctions and releases appeared to conflict, were vague, and may well violate Fifth Circuit precedent. Accordingly, by Order dated December 11, 2012, the Court granted PPL one last opportunity to file a third modification to its proposed Plan to remove or clarify such third party non-debtor injunctions and releases by December 19, 2012 (PPL Case, dkt# 390).

On December 19, 2012, PPL filed its Third Preconfirmation Modification to Third Amended Plan (herein "Third PPL Plan Modification") (PPL Case, dkt# 396). The Third PPL Plan Modification states that PPL is striking the prior injunction language, but "solely at the request of" and as "expressly required" by the City,[23] the PPL Plan now includes the following "injunction language":

(¶1) Upon the Effective Date, except for Causes of Action arising under the Settlement Agreement or the Plan, (i) each of the Participating Parties shall be deemed to forever waive, release, and discharge any and all Causes of Action against another Participating Party that is based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan and (ii) in exchange for the preceding release of

---

[22] Section 1129(a)(1) basically provides that a court can confirm a plan only if the plan complies with the applicable provisions of the Bankruptcy Code. 11 U.S.C. §1129(a)(1). As the Court has determined that the PPL Plan does not comply with the applicable provisions of §363(f) of the Bankruptcy Code, the Court must deny confirmation of the PPL Plan.

[23] In the Court's view, there is little doubt that PPL would have preferred to have completely removed the non-debtor injunction, releases and exculpation language from the PPL Plan. PPL all but admits in its post-hearing memorandum that these proposed non-debtor releases and exculpations do not comply with Fifth Circuit precedent (PPL Case, dkt# 398, pp. 19–20). However, under the Settlement Agreement between the City and PPL, the City was given the right to mandate the language used in drafting the PPL Plan, which undoubtedly caused PPL to continue to include these type of non-debtor release and exculpation provisions in its Plan. *See* Settlement Agreement (PPL Case, dkt# 283, Ex. A, ¶16).

the Participating Parties and for the funding of this Plan by City of El Paso, each Participating Party shall be deemed to forever waive, release, and discharge any and all Causes of Action against City of El Paso that is based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan.

(¶2) Neither the Debtor Participating Parties, nor the City of El Paso shall have or incur any liability to any holder of a Claim or an Interest, the Bank, or any other party in interest, including the Debtor or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan; the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the plan.

(¶3) Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys; affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Debtor, the Estate, the Reorganized Debtor, Participating Parties, the City of El Paso or any of their respective present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases; the pursuit of confirmation of the Plan, consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

See Third PPL Plan Modification (PPL Case, dkt# 396, pp. 9–10) (¶added).

For several reasons, the Court concludes that these revisions in the Third PPL Plan Modification—which the Court will refer to collectively as the "Non-Debtor Releases/Exculpations" and will identify by paragraph symbol (¶)—do not fix the vague and overbroad problems, are improper under Fifth Circuit precedent, and render the PPL Plan unconfirmable.

First of all, the Non-Debtor Releases/Exculpations continue to be vague and contain several undefined terms. For example, ¶1 provides that each of the "Participating Parties" shall release all "Causes of Action" against the other "Participating Parties", and that each "Participating Party" shall release all "Causes of Action" against the City. Yet nowhere are the terms "Participating Parties" or "Causes of Action" defined in the PPL Plan or in the definitions set forth in the PPL Disclosure

Statement (PPL Case, dkt# 282, pp. 57–64). Similar problems exist in ¶2 and ¶3— which contain undefined terms such as "Debtor Participating Parties", "Chapter 11 Cases", and again "Participating Parties". One might well assume that the term "Participating Parties" would include 3LM and Monaco (which participated in the PPL Case and PPL Plan confirmation hearings) and that the term "Chapter 11 Cases" would include both the PPL Case and the 3LM Case. If so, these Plan provisions are non-consensual, non-debtor releases and exculpations which have been forbidden by the Fifth Circuit as discussed below.

Second, the Non-Debtor Releases/Exculpations continue to be overbroad. For example, ¶1 provides that the each of the Participating Parties shall release the other Participating Parties and the City from all "Causes of Action" (which is undefined) that is "based on any act or omission or event" occurring prior to the effective date of the PPL Plan. Reading this language plainly, this provision is a global release of all claims of any kind whatsoever, and would release claims and causes of action that have nothing to do with PPL (the Debtor) and Hawkins Plaza  (the Debtor PPL's asset proposed to be sold to the City).

In this regard, the Court feels compelled to distinguish between this impermissibly overbroad release set forth in ¶1, and a permissible narrowly tailored release and injunction that often accompanies a §363(f) sale of a debtor's property free and clear of claims. The essence of a §363(f) sale free and clear is that the purchaser of the debtor's property will not be liable for claims of creditors against the debtor, and the purchaser is effectively insulated from such creditor's claims. Courts (including this one) have often permitted a narrowly tailored release and injunction in a §363(f) sale order to ensure that the purchaser of the debtor's property (as well as the debtor's property being sold) is insulated from claims that creditors might have against the debtor and the property being sold by the debtor to the purchaser. *See e.g., In re Camp Arrowhead, Ltd.,* 451 B.R. 678, 690 (Bankr. W.D. Tex. 2011); *see also Regions Bank of Louisiana v. Rivet*, 224 F.3d 483, 491–92 (5th Cir. 2000). But a narrowly tailored release that could permissibly accompany a §363(f) sale is not what is proposed in ¶1 of the Non-Debtor Releases/Exculpations in the PPL Plan. Instead, ¶1 appears to seek a global release of all claims and causes of action, that would include within its scope claims and causes of action that have nothing to do with PPL (the Debtor) or the property (Hawkins Plaza) proposed to be sold to the City under §363(f).

Third, ¶1 of the Non-Debtor Releases/Exculpations in the PPL Plan appears to be a non-debtor, non-consensual release forbidden by Fifth Circuit precedent. ¶1 purports to provide for a release by all "Participating Parties" of all causes of action against all other "Participating Parties", including the City. Although suffering from vagueness as described above, it appears clear that ¶1 is seeking to release parties in addition to the Debtor PPL—such as the City and other non-debtor Participating Parties. The Fifth Circuit takes a very restrictive approach to non-debtor releases in bankruptcy cases. Quoting the most recent case from the Fifth Circuit on this subject: non-consensual, non-debtor releases in bankruptcy proceedings in this circuit have been "explicitly prohibited", this circuit has "firmly pronounced its opposition to such releases",

and the "Bankruptcy Code precludes non-consensual, non-debtor releases". *In re Vitro SAB de CV*, --- F.3d ---, 2012 WL 5935630 at *15, 17, 21 (5th Cir. Nov. 28, 2012). The Fifth Circuit cases seem "broadly to foreclose non-consensual non-debtor releases and permanent injunctions" in bankruptcy proceedings. *In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) (citing *In re Coho Res., Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53–54 (5th Cir. 1993); *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995)).[24]

Here, the non-debtor releases proposed in the PPL Plan are non-consensual—as 3LM (as well as Monaco) have affirmatively objected and not consented to such non-debtor releases. Accordingly, because the releases are expressly not consensual, the non-debtor releases in ¶1 of the PPL Plan cannot be approved by the Court under binding Fifth Circuit precedent.

In its post-hearing memorandum, PPL recognizes this Fifth Circuit precedent, but urges the Court to follow other Circuit and lower court decisions that permit non-debtor, non-consensual releases and injunctions in extraordinary circumstances (PPL Case, dkt# 398, pp. 24–36). The fundamental problem with PPL's argument is that this Court is not located in those other circuits—this Court is located in the Fifth Circuit and is bound by the Fifth Circuit precedent. Indeed, the Fifth Circuit itself has recognized that other circuits have taken a more lenient view toward non-debtor releases under certain extraordinary circumstances, but the Fifth Circuit has expressly declined to follow the views of these other circuits. *See Vitro*, 2012 WL 5935630 at *16–17.

Finally, ¶2 and ¶3 of the Non-Debtor Releases/Exculpations in the PPL Plan appear to be "exculpation clauses" that are so broad that they do not comply with Fifth Circuit precedent. In substance, ¶2 and ¶3 provide that the City, and the present and former members, officers, directors, employees, advisors, attorneys and agents of the City and Debtor PPL, will have no liability for any act or omission arising out of the PPL bankruptcy case and the PPL Plan to any creditor of PPL (and such creditor's agents, employees, representatives, and professionals), <u>except for</u> gross negligence and willful misconduct. In bankruptcy parlance, these types of provisions are often referred to as "exculpation clauses"—as they exculpate (or release from liability) non-debtor parties for actions taken during a bankruptcy case, unless the actions taken constitute gross negligence or are willful misconduct. In essence, the exculpation clauses release non-debtor parties from negligence claims.

This type of exculpation clause has been widely used and adopted in bankruptcy plans until relatively recently, when the Fifth Circuit struck down part of a plan

---

[24] Amazingly, the City objected to the 3LM Competing Plan on the basis that the 3LM Competing Plan had improper non-debtor releases, and cited to many of these same Fifth Circuit cases as support for its objection (PPL Case, dkt# 319, 325, 326). 3LM then amended its Competing Plan to remove the non-debtor releases (PPL Case, dkt# 358). The City however, has apparently insisted on keeping non-debtor releases in the City's favor in the PPL Plan (PPL Case, dkt# 396, p. 8, 9).

exculpation clause. *See Pacific Lumber,* 584 F.3d at 251–53 (5th Cir. 2009). In *Pacific Lumber*, the Fifth Circuit dealt with a plan exculpation clause that released the purchaser of the debtor's assets, the debtor, the statutory Creditors Committee, and their personnel from liability relating to the chapter 11 plan, except for willfulness and gross negligence. 584 F.3d at 251. A group of creditors objected to the plan exculpation clause and appealed to the Fifth Circuit on this and other more substantive grounds.  In short, the Fifth Circuit struck down the plan exculpation clause, other than the exculpation of the statutory Creditors Committee and its members. In striking the plan exculpation clause (which was also called a "non-debtor release" by the *Pacific Lumber* Court), the Fifth Circuit stated "[w]e see little equitable about protecting the released non-debtors from negligence suits arising out of the (bankruptcy) reorganization . . . the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start §524(e) (of the Bankruptcy Code) provides to debtors is not intended to serve this purpose." 584 F.3d at 252–53 (added). Here, the exculpation clauses in ¶2 and ¶3 of the PPL Plan are too broad, have been expressly objected to by 3LM and Monaco and are thus non-consensual, and therefore run afoul of the Fifth Circuit decision in  *Pacific Lumber*.

In finding that the Non-Debtor Releases/Exculpations in the PPL Plan do not comply with binding Fifth Circuit precedent, the Court is <u>not</u> suggesting that the City, PPL (or their principals and attorneys) are liable for or have committed any wrongdoing or negligence in this bankruptcy case. Instead, in the Court's view (albeit a limited one), PPL, the City, their agents and attorneys have acted responsibly in negotiating and attempting to obtain Court approval of the Settlement Agreement and PPL Plan to resolve their disputes. And the Court can understand why the City would want a release and exculpation in this bankruptcy case, as 3LM and Monaco have shown themselves to be very litigious, sometimes regardless of the merits. Yet the Court cannot approve and confirm the PPL Plan when it contains non-consensual, non-debtor releases and exculpations that violate Fifth Circuit precedent. This is not a question of what this Court might want to do, but a function of what this Court is bound to do under the governing law.

In sum, the Court must conclude that the Non-Debtor Releases/Exculpations proposed in the PPL Plan are vague, overbroad, and do not comply with Fifth Circuit precedent and the Bankruptcy Code because they are non-consensual. Confirmation of the PPL Plan must therefore be denied for this reason as well.

### 4.  Conclusion

In conclusion, confirmation of the PPL Plan must be denied for the two reasons set forth above: (1) none of the statutory conditions of §363(f) have been satisfied by PPL that would authorize a sale of Hawkins Plaza to the City free and clear of 3LM's leasehold interest as provided for in the PPL Plan; and (2) the PPL Plan contains improper non-debtor releases and exculpations that are not consensual. It is not necessary or advisable for the Court to address the other objections raised to

confirmation of the PPL Plan, especially given the girth of this Consolidated Opinion.

However, the Court takes no pleasure in denying confirmation of the PPL Plan that incorporates the proposed Settlement Agreement between the City and PPL. The Court can see the wisdom of the proposed Settlement Agreement, and standing alone (from PPL's perspective) it would pass muster under the settlement standards set forth by Bankruptcy Rule 9019 and governing case law. *See e.g., In re Jackson Brewing Co.*, 624 F.2d 605, 607–08 (5th Cir. 1980). The Settlement Agreement was the product of lengthy, arms length mediation between the City and PPL before an independent mediator. The proposed settlement enjoys the support of the vast majority of PPL's creditors, including City Bank. The sale of Hawkins Plaza under the settlement to the City would have generated a pool of funds to pay creditors of PPL. The settlement would have resolved lengthy and uncertain litigation between the City and PPL. Much time, effort and expense has gone into the proposed settlement and PPL Plan. PPL has used considerable effort to try to improve the PPL Plan and the treatment of 3LM using the Settlement Agreement, which is recognized and appreciated by the Court. But in the end, unfortunately, the PPL Plan and related Settlement Agreement do not meet the legal requirements necessary to confirm the PPL Plan under the Bankruptcy Code for the reasons set forth above.

## D.  **PPL PLAN-RELATED MOTIONS—PPL CASE**

Finally, the Court will briefly address and rule on the remaining Motions filed in the PPL Case that are included in the Contested Matters and related to the PPL Plan.

### 1.  **Motion to Value Leasehold**

PPL has filed a Motion For Determination of Value of Leasehold Interest of Three Legged Monkey at Hawkins Plaza Shopping Center Pursuant to 11 U.S.C. §363(e) and (f) in the PPL Case (herein "Motion to Value Leasehold") (PPL Case, dkt# 330), and 3LM has filed an objection to such Motion. In general, through this Motion, PPL requests the Court to value 3LM's leasehold interest for the purpose of providing adequate protection under §363(e) to 3LM so that Hawkins Plaza can be sold to the City under the PPL Plan free and clear of 3LM's leasehold interest under §363(f) of the Bankruptcy Code.

As the Court has already concluded for the reasons set forth above that Hawkins Plaza cannot be sold free and clear of 3LM's leasehold interest under §363(f) and the PPL Plan cannot be confirmed, it is not necessary or advisable for the Court to rule on the Motion to Value Leasehold and it is moot. Accordingly, the Court will deny the Motion to Value Leasehold as moot.

### 2.  **3LM Motion to Strike Ballots**

3LM has filed an Expedited Motion To Designate the Classes of 1(A) and 3 As Being Unimpaired and Strike the Ballots of Such Classes As Not Being Accepted,

Solicited or Procured in Good faith Pursuant to 11 U.S.C. §1126(E)  in the PPL Case (herein "<u>3LM Motion to Strike Ballots</u>") (PPL Case, dkt# 337). City Bank and PPL have filed responses and objections to such Motion. In general, through this Motion, 3LM seeks to strike the ballots of City Bank and other tenants which voted in favor of the PPL Plan.

As the Court has already concluded as set forth above that the PPL Plan cannot be confirmed for other reasons, it is not necessary or advisable for the Court to rule on the 3LM Motion to Strike Ballots and it is moot. Accordingly, the Court will deny the 3LM Motion to Strike Ballots as moot.

### 3.  PPL Request to Strike Ballots

PPL has filed a Request to Strike Ballots of Three Legged Monkey in the PPL Case (herein "<u>PPL Request to Strike Ballots</u>") (PPL Case, dkt# 357). In general, through this Request, PPL seeks to strike the ballots of 3LM, who voted against the PPL Plan.

As the Court has already concluded as set forth above that the PPL Plan cannot be confirmed for other reasons, it is not necessary or advisable for the Court to rule on the PPL Request to Strike Ballots and it is moot. Accordingly, the Court will deny the PPL Request to Strike Ballots as moot.

### V.
### <u>CONCLUSION</u>

It is undoubtedly frustrating for the parties (and is certainly for the Court), to spend as much time, effort and expense in these two bankruptcy cases for this not to be the final episode in the ongoing saga over Hawkins Plaza. These bankruptcy cases may well illustrate the maxim that "litigating Chapter 11 cases are usually not successful". This is often true because a litigating Chapter 11 case is very expensive for the Chapter 11 debtor in bankruptcy, as it must bear the expensive freight of professionals and still try to reorganize its businesses and repay its creditors. Often a litigating Chapter 11 case fails, because the debtor may lose the litigation battles—and even when the debtor wins the litigation battles, the legal freight of constantly litigating is too much for the debtor-company to endure.  A Chapter 11 debtor must pick its litigation battles carefully, lest it win a battle but lose the war. In part for this reason, Chapter 11 of the Bankruptcy Code was designed to promote and encourage consensual resolution of disputes whenever possible.  Indeed, in the words of the U.S. Supreme Court, compromises in bankruptcy are "a normal part of the process of reorganization".[25]

Here, we have two Chapter 11 debtors (PPL and 3LM) engaged in heated battle. Admittedly with the benefit of some hindsight, the Court can understand why PPL and the 3LM ended up in this particular battle.  In simplest terms, PPL filed Chapter 11 to protect its business-Hawkins Plaza. Hawkins Plaza was in danger because of the

---

[25] *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 130 (1939).

threatened termination by the City of PPL's Ground Lease for Hawkins Plaza, based largely on 3LM's establishment at Hawkins Plaza. PPL then went to a Court-ordered mediation with the City and (to avoid a battle) negotiated a settlement that would resolve PPL's disputes with the City, but would also have the consequence of putting its largest tenant (3LM) out of business. This in turn caused 3LM to raise an army, file Chapter 11 to protect its business, and to start a battle to oppose the proposed settlement between PPL and the City. PPL ended up being forced to battle and litigate with 3LM in an effort to obtain Court approval of its proposed settlement with the City through its Plan of Reorganization. The litigation battle quickly escalated from there, with 3LM filing a competing Plan of Reorganization for PPL and seeking to assume its Shopping Center Lease at Hawkins Plaza, which PPL then vigorously opposed.

So now at the end of this particular battle, and after literally hundreds of thousands of dollars in litigation expense, hundreds of hours spent by the parties and this Court, and a plethora of documents, exhibits, and pleadings—little has been accomplished. 3LM is still in business (at least for a while) at Hawkins Plaza, PPL is still stuck in the middle of what (in essence) is a dispute between the City and 3LM that threatens Hawkins Plaza, and all parties have incurred significant professional fees. This must change in the future, or one or both of these Chapter 11 debtors will end up losing the war.

It is possible that further battles in this war can be avoided. Perhaps the proposed sale of Hawkins Plaza to the City can be resurrected by negotiation to obtain 3LM's consent to the Hawkins Plaza sale (§363(f)(2)) and providing 3LM with sufficient time and funds to relocate. Or, perhaps 3LM can stay in business at Hawkins Plaza by the parties jointly negotiating more restrictive terms in the Shopping Center Lease and the Ground Lease. Or, perhaps these will continue to be litigating Chapter 11 cases, with new battles immediately on the horizon over whether the Ground Lease with the City can be assumed by PPL and whether 3LM is capable of proposing and obtaining approval of a plan of reorganization in its own bankruptcy case. In any event, it is not the Court's job to negotiate settlements between the parties; instead the Court's job is to rule on controversies and approve settlements that comply with the Bankruptcy Code.

But for now with respect to this current battle, and for the reasons set forth in this Consolidated Opinion, on even date herewith the Court will enter separate Orders in the pending Contested Matters as follows: (1) in the 3LM Case, an Order Granting the Motion to Assume Non-Residential Lease of Real Property With Patriot Place Pursuant to 11 U.S.C §365 filed by 3LM (herein "Motion to Assume Shopping Center Lease") (3LM Case, dkt# 18); (2) in the PPL Case, an Order Denying Confirmation of 3LM's Competing Second Amended Plan of Reorganization, As Amended, filed by 3LM (PPL Case, dkt# 275, 358) (herein "3LM Competing Plan"); (3) in the PPL Case, an Order Denying Confirmation of PPL's Third Amended Plan of Reorganization, As Modified by the First, Second and Third Preconfirmation Modifications filed by PPL (PPL Case, dkt# 283, 348, 367, 396) (herein "PPL Plan"); (4) in the PPL Case, an Order Denying As Moot the Motion For Determination of Value of Leasehold Interest of Three Legged Monkey at Hawkins Plaza Shopping Center Pursuant to 11 U.S.C. §363(e) and (f) filed

by PPL (herein "<u>Motion to Value Leasehold</u>") (PPL Case, dkt# 330); (5) in the PPL Case, an Order Denying As Moot the Expedited Motion To Designate the Classes of 1(A) and 3 As Being Unimpaired and Strike the Ballots of Such Classes As Not Being Accepted, Solicited or Procured in Good faith Pursuant to 11 U.S.C. §1126(e)  filed by 3LM (herein "<u>3LM Motion to Strike Ballots</u>") (PPL Case, dkt# 337); and (6) in the PPL Case, an Order Denying As Moot the Request to Strike Ballots of Three Legged Monkey filed by PPL (herein "<u>PPL Request to Strike Ballots</u>") (PPL Case, dkt# 357).

The Court will also enter an Order in the PPL Case and an Order in the 3LM Case setting a status conference in each of the respective bankruptcy cases.